## HATCH'S ESTATE v. COMMISSIONER OF INTERNAL REVENUE.

### No. 12928.

United States Court of Appeals
Ninth Circuit.
June 19, 1952.

Frederic D. Dassori, Dee R. Bramwell,. Washington, D. C. (Edwin A. Mooers, Jr.,. Stokes, Bramwell & Dassori, Washington,. D. C., of counsel), for petitioners.

Ellis N. Slack, Acting Asst. Atty. Gen.,. Lee A. Jackson, Melva M. Graney, Loring M. Post, Sp. Assts. to the Atty. Gen., for respondent.

Before DENMAN, Chief Judge, and STEPHENS and BONE, Circuit Judges.

STEPHENS, Circuit Judge.

On December 1, 1942, Herbert B. Hatch, now deceased, Juanita O. Hatch, and Herbert B. Hatch, Jr., all of Stockton, California, entered into a partnership under the laws of California for, and thereafter they conducted a business of, selling,.

distributing, repairing, and servicing motor vehicles and motor vehicle parts at wholesale and retail under the business name of Hatch Chevrolet Co.[1] On February 16, 1944, the partners and King M. Chase signed a written agreement providing for the sale of "all of the business of Hatch Chevrolet Company" to Chase and that Chase should take "possession of the physical assets of the business" on February 21, 1944, with "permission to operate the business under the name of Hatch Chevrolet Company for a limited period of time to enable him to make the necessary arrangements for the future title or trade name of said business." (All of the above quotations are from the written instrument.)

Pursuant to the agreement the parties executed a Bill of Sale on the 3rd day of March, 1944, to personal property described in detail,[2] and $161,807.77 was paid by check and thereafter deposited by the co-partners in their co-partner bank account where it remained intact until June, 1944, a couple of weeks after the death of Herbert B. Hatch. All of the partnership assets were transferred except for $35,249.90 in cash, two automobiles of the total book value of $1,542.66 and debts owing in the amount of $15,588.55.

An amended partnership return of income for the fiscal year beginning July 1, 1943, and ending June 30, 1944, was filed by the "Hatch Chevrolet Company" on September 19, 1944, by which the partnership reported an ordinary net income in the amount of $75,444.43 and a long-term capital gain from the sale of the business of $36,669.07, of which $18,334.54, or one-half, was taken into account in the computation of taxes.[3] Since a partnership is not taxable as a whole, the taxpayers reported their individual incomes for 1944 as follows:

| | Ordinary Income | Recognized Long Term Capitol Gains |
| --- | --- | --- |
| Herbert B. Hatch | $42,337.04 | $ 9,778.42 |
| Juanita O. Hatch | 27,431.85 | 7,089.35 |
| Herbert B. Hatch, Jr. | 5,675.54 | 1,466.77 |
| | $75,444.43 | $18,334.54 |

The Commissioner disagreed with the taxpayers' treatment of the tax aspects of the sale, and on February 20, 1948, notified them of a deficiency in each of their returns for the tax year 1944. The Commissioner allowed a capital gain in the amount of $22,486.36, which is recognizable for tax purposes to the extent of $11,243.18;

1. Their respective interests in the partnership were as follows:
 Herbert B. Hatch ..........40/75ths
 Juanita O. Hatch ..........29/75ths
 Herbert B. Hatch, Jr. ...... 6/75ths

2. "All that property set forth and described in the inventories listing said personal property—
 "(1) Parts Department Inventory consisting of 165 pages.
 "(2) Accessory Department and Miscellaneous Merchandise consisting of 18 pages.
 "(3) Gas, Oil and Grease Inventory consisting of one page.
 "(4) Duco Material Inventory consisting of 5 pages.
 "(5) Work in Process & Sublet Repairs consisting of 5 pages.
 "(6) Tire Department Inventory consisting of 6 pages.
 "(7) Machinery and Shop Equipment consisting of 19 pages.
 "(8) Parts & Accessory Equipment consisting of one page.

"(9) Furniture & Fixtures consisting of 7 pages.
 "(10) Service Cars (7) consisting of one page.
 "(11) Other Fixed Assets, consisting of one page.
 "(12) New Cars (4) consisting of one page.
 "(13) New Car Freight and Handling plus increment consisting of one page.
 "(14) Used Cars (13) consisting of one page."

3. Section 117(b) Internal Revenue Code, 26 U.S.C.A. § 117(b):
 "In the case of a taxpayer, other than a corporation, only the following percentages of the gain or loss recognized upon the sale or exchange of a capital asset shall be taken into account in computing net capital gain, net capital loss, and net income:
 "100 per centum if the capital asset has been held for not more than 6 months;
 "50 per centum if the capital asset has been held for more than 6 months."

but assessed a deficiency on the ground that gain from the sale in the amount of $14,182.71 was ordinary income from the sale of property other than capital assets. As divided among the individual taxpayers the deficiencies claimed are as follows:

Estate of Herbert B. Hatch, Deceased ...................... $3,702.31
Juanita O. Hatch .............. 2,199.38
Herbert B. Hatch, Jr............ 187.22

 The Commissioner's deficiency assessment against each of the appellants was sustained by the Tax Court, 14 T.C. 251, in accordance with the following thesis: "Where individuals acting as partners sell to another most of the assets of a partnership subject to some of its liabilities, without a distribution of the assets to the partners prior to the sale, and the partnership survives the sale, the transaction is a sale by the partnership of some of its assets and not a sale by the partners individually of their interests in the partnership, for the purpose of determining to what extent the gain realized upon the sale is taxable to the partners as capital gain." The taxpayers appeal from the decision of the Tax Court.

Generally speaking, the rule used by the Tax Court appears sound enough, but in dealing with a tax matter we must be guided by the substance and effect of what was done. United States v. Phellis, 1921, 257 U.S. 156, 168, 42 S.Ct. 63, 66 L.Ed. 180. This is not to say that we are to disregard the language used in a contract which may be involved, or the methods used to effect the transaction. But rather, we must consider the form and steps used in their relation to the intended and accomplished entire transaction. Halliburton v. C. I. R., 1935, 9 Cir., 78 F.2d 265. As the old homely saying has it, "The tail must not wag the dog."

The Commissioner contends, and the Tax Court held, that what the taxpayers sold were the various separate assets of the business, the gains from which would be the subject of ordinary income for tax purposes, and not their partnership interests at all. Decision in this case pivots on this point.

Section 117(b) of the Internal Revenue Code permits a person who sells a capital asset which he has held for over 6 months to report only 50 per centum of his gain or loss for income tax purposes. A partnership is not a taxable entity. Thus, persons who carry on business in partnership are liable for income tax in their individual capacities. Section 181, I.R.C., 26 U.S.C.A. § 181. And in computing the net income of each partner, the distributive share of the partnership's gains or losses from its sales or exchanges of capital assets held for over 6 months must be reported as part of the partner's capital gains or losses whether or not distribution has been made to him. Section 182(b), I.R.C., 26 U.S.C.A. § 182(b).

Where a partnership interest had been sold, the Commissioner of Internal Revenue for many years treated it as the sale of the selling partner's undivided interest in each specific partnership asset and thus ordinary income to the partner under Section 182(c) I.R.C. This position was based on the reasoning that since a partnership, both at common law and as codified under the Uniform Partnership Act,[4] is "an association of two or more persons to carry on as co-owners a business for profit",[5] it is not an entity in which a person could have a separate and distinct part interest. And since each partner "is co-owner with his partners of specific partnership property holding as a tenant in partnership,"[6] any sale by a partner of what he owned in a partnership amounted to the sale of his undivided share of each specific partnership asset.

 However, in 1950, the Commissioner of Internal Revenue acquiesced to

4. Adopted in California, Civil Code, 1937 ed., Sections 2395 et seq., (now Sections 15001 et seq., California Corporations Code).

5. Section 2400, California Civil Code, 1937 ed., (now Section 15006, California Corporations Code).

6. Section 2419, California Civil Code, 1937 ed. (now § 15025 California Corporations Code).

the overwhelming case authority[7] to the effect that for income tax purposes the sale of a partnership interest in a going concern should be treated as the sale of a capital asset.[8] Such has been the rule in this circuit since the decision of Stilgenbaur v. United States, 9 Cir., 1940, 115 F.2d 283, 286, 287. For despite the fact that a partner is said to be a co-owner of "specific partnership property", his right to possess such property is limited to partnership purposes,[9] and his right to the specific property is non-assignable.[10] Thus, the nature of the interest which a partner actually has in the partnership itself is the right to share in profits and surplus[11] and the right to share in the net value of the partnership after settlement of its affairs. Clarke v. Fiedler, 1941, 44 Cal.App.2d 838, 113 P.2d 275. And this partnership interest is personal property which is separate and distinct from his co-ownership of the specific partnership property. Dudley T. Humphrey v. C. I. R., 1935, 32 B.T.A. 280.

The Commissioner qualified his acquiescence to the treatment of a partnership interest as a capital asset with the proviso: "The application of this rule should, of course, be limited to those cases in which the transaction in substance and effect, as distinguished from form and appearance, is essentially the sale of a partnership interest. See Estate of Herbert B. Hatch, et al. v. Commissioner, 14 T.C. 251."[12] While we agree with the statement of the Commissioner, we believe it is unsupported by the facts of the case cited.

Thus the controversy here is reduced to a determination of whether what the taxpayers sold were the business assets, and as such the source of ordinary income, or their partnership interests, and as such the source of capital gains.

The Commissioner contends that this was a sale of the business assets since the Bill of Sale sets forth the specific items of personal property which were transferred.[13] He further argues that the taxpayers did not sell their partnership interests since they kept all of the firm's cash in the amount of $35,249.90, two used automobiles, certain partnership liabilities, the garage, the Chevrolet sales and service franchise, the good will, and the firm name, all of which would enable the taxpayers to continue the partnership business. And finally, the Commissioner contends that the taxpayers continued to keep the partnership in existence, after the sale here involved, as evidenced by the fact that the proceeds of the sale were kept in the bank under the name of the Hatches, as co-partners, without distribution until several months after the sale; and that appellants filed a partnership return of income on September 19, 1944.

The first suggestion is that the list of assets set forth in the Bill of Sale is the exclusive list of what was sold. However, this document must be read as a part of the whole transaction. The list of property entitled "Bill of Sale" was only an appendage to the principal agreement which was embodied in the Agreement of Sale, and the purchase compensation was only a part of the total compensation paid. The first document was an Agreement of Sale wherein the taxpayers agreed to sell to Chase "all of the business and assets of Hatch Chevrolet Company, a co-partnership, hereinafter listed." And after the transfer, Chase was to "operate the business" as his own. Thus, it was the ex-

---

7. Kessler v. United States, 3 Cir., 1941, 124 F.2d 152; C.I.R. v. Shapiro, 6 Cir., 1942, 125 F.2d 532; Thornley v. C.I.R., 3 Cir., 1944, 147 F.2d 416; C.I.R. v. Lehman, 2 Cir., 1948, 165 F.2d 383, certiorari denied 334 U.S. 819, 68 S.Ct. 1085, 92 L.Ed. 1749; C.I.R. v. Smith, 5 Cir., 1949, 173 F.2d 470; Long v. C.I.R., 5 Cir., 1949, 173 F.2d 471.

8. G.C.M. 26379, 1950–1 Cum.Bull. 58, Prentiss Hall Federal Tax Service Vol. 4 (1950), Par. 76,288.

9. Section 2419(2) (a) California Civil Code, 1937 ed.

10. Section 2419(2) (b) California Civil Code, 1937 ed.

11. Section 2420 California Civil Code, 1937 ed., (now Section 15026 California Corporations Code).

12. G.C.M. 26379, 1950–1 Cum.Bull. 58, Prentiss Hall Federal Tax Service Vol. 4 (1950), Par. 76,288.

13. See footnote 2, supra.

pressed intention of the taxpayers to sell their business as a going concern and not just a specified list of their stock in trade. The expressed purpose of the inventory list in the Bill of Sale was to enable the parties to adjust the tentative selling price of $175,229.51 to accord with the appraised allowance for the items in it.[14] The two documents constitute the written record of a single transaction.

The Commissioner cites Williams v. McGowan, 2 Cir., 1945, 152 F.2d 570, 572, 573, 162 A.L.R. 1036, wherein the 2nd circuit declared that since the Uniform Partnership Act has not changed a firm into a "juristic entity" the sale of a going business whether it is a partnership or an individually owned enterprise must be comminuted into its fragments which are to be separately matched against the definition of Section 117(a)(1) of the Internal Revenue Code. While we regard the partnership as an aggregate rather than an entity, where an entire business has been sold as a going concern we agree with the reasoning of Judge Frank who said by way of dissent in the cited case: "I agree that it is irrelevant that the business was once owned by a partnership. For when the sale * * * occurred, the partnership was dead, had become merely a memory, a ghost. To say that the sale was of the partnership's assets would, then, be to indulge in animism. But I do not agree that we should ignore what the parties to the sale * * * actually did. They did not arrange for a transfer to the buyer, as if in separate bundles, of the several ingredients of the business. They contracted for the sale of the entire business as a going concern." So too, in this case, it was not the inventory as such which was sold by appellants, it was their business as a going concern.

That it was the business as a whole and not the individual assets which were sold is further indicated by the fact that the measure of the portion of the total sales price which was assigned to the inventory under the Agreement of Sale was the *cost* of said inventory items. But the total

sales price was more than the cost of the physical assets sold. Therefore, no gain was realized from the transfer of the inventory. Such gain as was realized must therefore be measured by the value of the aggregate of the inventory, machinery *and good will* unit of a going concern.

Next the Commissioner argues that the appellants retained their partnership interests as evidenced by certain assets, tangible and intangible, which were not transferred. One such asset was the $35,249.90 in cash in the bank under the partnership name. It would not be business like to sell cash and nothing can be premised upon this count. The taxpayers kept two automobiles of small value. There could not be any significance in this fact.

The partnership liabilities which were not transferred had been incurred prior to the date of sale of the business. The agreement on this point was simply consistent with the principle that a debtor cannot transfer his obligation without consent of his creditor.

The fact that a garage was not transferred was first mentioned in the Commissioner's brief. There is no evidence at all as to the housing of the business. The terms of the contract indicate that there was repair machinery and of course a place for automobiles under repair and probably a show room. Beyond this there is no showing as to a garage. What the purchaser did or contemplated doing in this regard we need not speculate. That the seller retained a garage connected with the business he sold is wholly unreasonable.

The Chevrolet sales and service franchise was not transferable. Akers v. C. I. R., 1946, 6 T.C. 693; Noyes-Buick Co. v. Nichols, D.C.1926, 14 F.2d 548.

Whatever good will the partners had must of necessity have been transferred since the agreement itself specifies that "all of the business of Hatch Chevrolet Company" was sold. "* * * Good will has no existence except in connection with a going business; it cannot be separated from the going business to which it is incident. A seller who disposes of

14. The final price was $161,807.77.

his manufacturing plant as a going concern necessarily parts with all those advantages which are inherent in conducting an established business at that plant; in other words, parts with his good will. [Citing many cases.] In Didlake v. Roden Grocery Co., 160 Ala. 484, 495, 49 So. 384, 387, 22 L.R.A.,N.S., 907, 18 Ann.Cas. 430, it is said: ' * * * But the authorities are clear to the effect that, if a business is sold out entirely and nothing is said about good will, it goes with the property. This necessarily results from the fact that the good will cannot exist except in connection with the business.' " Pfleghar Hardware Specialty Co. v. Blair, 2 Cir., 1929, 30 F.2d 614, 616, 617.

The Commissioner also contends that the taxpayers kept the firm name and in so doing evidenced an intention to continue the partnership business. However, the agreement shows that Chase was permitted "to operate the business under the name of Hatch Chevrolet Company for a limited period of time to enable him to make the necessary arrangements for the future title or trade name of said business." It is not inconsistent with the taxpayers' sale of their partnership interests that they gave Chase permission to use the name "Hatch Chevrolet Company" only during the transition period. If the partnership had existed under the style of a fictitious name, there would probably have been no need to restrict the new owner's use of the name. The use of the Hatch name by Chase only through the transition stage of the business was entirely consistent with the terms of the agreement for the sale of "all the business of the Hatch Chevrolet Company." It is not unusual for the use of a family name to be restricted where, as here, its reputation would have been subject to the acts of a stranger and further would not speak the truth to the public dealing with business under its new ownership.

Finally we come to the argument that the sale was not of appellants' partnership interests since they continued the partnership in existence after the sale. The partnership income return which was filed in September 1944, does not constitute an admission that the partnership was in existence until that time. The partnership return was actually only a report to the Commissioner of Internal Revenue concerning the partnership income prior to the sale and the gain realized from the sale of the business. Since it is the individual partners and not the partnership, itself, who pay income taxes, this report was merely the basis of the taxpayers' 1944 personal income tax returns.

Nor does the retention of the proceeds of the sale in the old business bank account for a short period prove an intent to continue the partnership business. The money was a family fund owned by the individuals in fixed proportions. There is no significance in the delay to distribute it out.

While it is with high appreciation of the immeasurable service the expert knowledge of the Tax Court has given and is currently giving to the country, we are convinced in this case that, like all specialists occasionally do, the court has fallen into the error of adhering too closely to a good general rule. We are convinced beyond any doubt that what the individuals, the partners and the purchaser, thought they were doing and what they really did do was to effectuate the change of ownership of a going business enterprise. There is no evidence in the case indicating a close out of the business by a liquidation of the stock in trade. The written contract states plainly that the business was being sold to one who contemplated an uninterrupted conduct of the business which was a paying one. The evidence relied upon by the Tax Court to support its decision is not contrary to the plain terms of the contract as written but is entirely consistent therewith.

The relevant events of this case were all before the Tax Court on stipulation and written contracts, hence there is no element present as to the credibility of witnesses. We think this is a clear case for the application of the "clearly erroneous" rule announced in United States v. United States Gypsum Co., 1948, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, for after a thorough consideration of the whole case, we are convinced that a mistake has been made by allowing incidental facts of little

or no significance to sway the Tax Court to find that the whole enterprise in suit was not transferred.

We conclude that what was sold here was each partner's partnership interest. See Thornley v. Commissioner, 3 Cir., 1944, 147 F.2d 416. The sale of a partnership interest constitutes a sale of a capital asset, and thus gives rise to a capital gain.

Reversed.