JOSEPH W. LA RUE, ET AL.,[1] PETITIONERS *v.*
COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket Nos. 22164-80, 22165-80, Filed March 21, 1988.
 1014-81, 3726-81,
 20879-81, 21096-81,
 23909-81, 21199-82,
 1867-83.

---

[1]Respondent determined the following deficiencies in these cases which have been consolidated for purposes of trial, briefing, and opinion:

| Docket No. | Petitioner[1] | Year | Deficiency |
|---|---|---|---|
| 22164-80 | Joseph La Rue | 1969 | $4,204.54 |
| | | 1970 | 341.50 |
| | | 1971 | 33,444.78 |
| 22165-80 | Otto and Patricia Lowe | 1969 | 882.37 |
| | | 1970 | 788.82 |
| | | 1971 | 24,561.70 |
| 1014-81, | Robert and Ellise Schiffer | 1968 | 1,339.42 |
| 21096-81 | | 1969 | 837.07 |
| | | 1970 | 1,105.99 |
| | | 1971 | 69,617.02 |
| 3726-81 | Alfred and Dorothy Fasulo | 1967 | 6,348.00 |
| | | 1968 | 10,007.00 |
| | | 1969 | 19,257.00 |
| | | 1971 | 13,865.00 |
| | | 1972 | 9,319.00 |
| 20879-81, | Mark and Wendy Ettinger | 1969 | 2,568.63 |
| 1867-83 | | 1971 | 3,548.53 |
| | | 1972 | 5,663.00 |
| | | 1973 | 6,016.00 |
| | | 1974 | 1,348.00 |
| 23909-81 | John Brick | 1969 | 2,875.70 |
| | | 1971 | 3,975.46 |
| | | 1972 | 2,605.70 |
| | | 1973 | 6,781.50 |
| | | 1974 | 8,221.53 |
| | | 1975 | 3,521.52 |
| 21199-82 | Alfred and Alexina Seaber | 1966 | 31,595.00 |
| | | 1968 | 180,648.00 |
| | | 1969 | 2,074.00 |
| | | 1970 | 4,250.00 |
| | | 1971 | 15,070.00 |
| | | 1972 | 20,808.00 |
| | | 1976 | 3,297.00 |
| | | 1977 | 6,120.00 |

[1]Middle initials omitted.

*James E. Tyrrell, Jr., Hunter L. Prillaman, Kenneth M. Hart, William O'C. Harnisch,* and *Joseph E. Boury,* for the petitioners.

*Laurence D. Ziegler* and *Theodore R. Leighton,* for the respondent.

GERBER, *Judge:* This is a consolidated action involving seven former general partners of Goodbody & Co., a broker-dealer in securities and commodities. This action is for redetermination of deficiencies arising out of the financial collapse of the Goodbody partnership and the accession to its assets and liabilities by Merrill, Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch). The issues for decision are: (1) Whether reserves reflecting "back office" errors are liabilities that may be included in the bases of petitioners' partnership interests; (2) whether and to what extent the transfer of petitioners' business resulted in relief from partnership liabilities, causing constructive distributions and reducing petitioners' bases in their partnership interests; and (3) whether petitioners should be allowed a deduction for the worthlessness of their partnership interests or abandonment of partnership assets, or whether the transaction constituted a sale, exchange or liquidation of petitioners' partnership interests.

## FINDINGS OF FACT

Many of the facts and exhibits are stipulated and are incorporated herein by this reference. Petitioners in this action are seven individuals who were formerly general partners of Goodbody & Co. (Goodbody), which was, until 1970, a partnership acting as a broker-dealer in securities and commodities. As of November 5, 1970, Goodbody, the nation's fifth largest stock brokerage firm, was a limited partnership organized under the laws of the State of New York, with 130 partners, 63 general partners, and 67 limited partners. Goodbody conducted a securities and commodities

business from approximately 100 domestic offices, serving approximately 225,000 customers.

In the late 1960s and early 1970s, the brokerage industry encountered logistical problems due to a failure of their record-keeping technology to keep up with trading volume. Known as "back office" problems, they were experienced by many member firms on the New York Stock Exchange (NYSE or Exchange), including Goodbody. These problems included the following types of transactions:

(1) Fails to Receive—securities which the broker should have purchased at a stated price were not purchased. Gain or loss was incurred on these transactions measured by the difference between the customer's contract price and what the broker had to pay to obtain the securities.

(2) Fails to Deliver—securities which the broker thought were sold to another broker but for which no "comparison" for proof could be provided. These securities then had to be sold and the gain or loss incurred was measured by the difference between the original sales price and the actual proceeds received.

(3) Securities Differences—these represented differences between the securities the broker's records stated it should be holding for its own or other's accounts and the securities actually "in the box." These resulted mainly from incorrect deliveries, receipts, or theft. Gain or loss was measured by the value of excess securities or their replacement cost.

(4) Dividend Errors—the broker was responsible to its customers for dividends and interest on securities which it held as nominee for its customers, securities held in "street name." If the broker failed to receive a dividend or interest payment when due, it was still liable to its customer for such amount.

NYSE members, including Goodbody, were subject to Exchange rules. Exchange rule 64 provided that settlement—payment for securities received or delivery of securities sold—must occur within 5 days of the contract date. Violations of this rule, caused by "back office" failures, resulted in the offending broker being liable to replace any missing securities or money.

Goodbody experienced a substantial amount of "back office" problems. Although the firm earned a profit in 1968,

in 1969 it sustained a $678,793 loss. These "back office" problems continued unabated and precipitated Goodbody's eventual financial instability during 1970.

As a consequence of the large losses generated by the "back office" problems, subordinated lenders withdrew capital from Goodbody. This in turn triggered concerns that Goodbody (and other firms) could violate the minimum capital requirements of the NYSE. Rule 325 of the Exchange stated that a firm's liabilities could not exceed 20 times its liquid capital.[2]

On August 28, 1970, Ernst & Ernst (Ernst), an accounting firm, pursuant to the Exchange's request, commenced a surprise audit of Goodbody for purposes of reporting on Goodbody's capital position. By letter dated September 11, 1970, Exchange notified Goodbody that certain withdrawals of firm capital would cause Goodbody to violate rule 325 as of October 1970. Another letter dated September 15, 1970, requested attendance of certain Goodbody partners at a special meeting of a committee of the Exchange to respond to concerns about Goodbody's capital requirements and securities count differences then estimated at $45 million.

In order to avert the impending capital violations, Goodbody sought to obtain additional capital from outside parties in September and October of 1970. On September 16, Goodbody's board of directors met and discussed its possible merger with Shareholder's Capital Corp. (SCC). Negotiations were still continuing with SCC when, on October 12, Utilities & Industries Corp. contacted Goodbody about the possibility of investing capital in the firm. The SCC negotiations terminated on October 15, and on October 28, Utilities & Industries Corporation terminated its negotiations.

In subsequent letters, Exchange directed further remedial measures, including liquidating some proprietary positions. Exchange's October 15 letter indicated that Goodbody had, according to calculations resulting from the surprise audit, fallen below the capital requirements by approximately $7 million. The letter warned that unless remedial capital measures were taken, Goodbody could be suspended from

---

[2]Under certain circumstances, subordinated borrowings could be considered liquid capital.

the Exchange, and, subsequently, could likely lose all of the firm's capital.

NYSE officials and its members, including Merrill Lynch, were concerned that a collapse of Goodbody, coupled with the resulting default in its customer accounts, would seriously erode public confidence in the securities industry. Moreover, other member firms were having similar difficulties and there was a concern that a default by Goodbody in its obligations to other firms would cause a "domino" type failure of a number of other firms. On October 22 and 27, 1970, Exchange officials met with representatives of major member firms in an attempt to assist Goodbody. Although Goodbody's precarious situation and the possible ramifications of a Goodbody failure for the industry as a whole were placed before the NYSE membership, no firm volunteered to assist Goodbody. Merrill Lynch, the largest firm in the industry, was represented at these meetings but, like the other firms, did not offer to assist Goodbody. Subsequently, the president of the NYSE went to see the chairman of Merrill Lynch in an attempt to convince him to change his mind and assist Goodbody. Merrill Lynch, the largest company with the most resources, was one of the few firms capable of absorbing the fifth largest firm, Goodbody.

On October 28, 1970, Goodbody, Merrill Lynch, and NYSE entered into an agreement under which Goodbody was to refrain from entering into any transactions, including borrowings, other than those arising in the ordinary course of business, and to provide Merrill Lynch all needed information and documents to facilitate Merrill Lynch's decision to assist Goodbody by assimilating it into Merrill Lynch. By agreement, most of the general partners of Goodbody authorized a representative group to negotiate with Merrill Lynch. Also, the U.S. Department of Justice advised Merrill Lynch that it did not intend to institute any antitrust proceeding as a result of a Goodbody acquisition.

On November 5, 1970, Merrill Lynch, NYSE, and Goodbody entered into a series of agreements under which Goodbody transferred its assets and liabilities to Merrill Lynch. The agreements are described below. Pertinent portions are quoted and others are summarized.

## (1) *Financing Agreement*

\* \* \* \* \* \* \*

WHEREAS, both [Goodbody] and the New York Stock Exchange (the "Exchange") have advised [Merrill Lynch] that [Goodbody] has an immediate need for substantial additional Net Capital, as such term is defined in the Exchange's Rule 325, in order to maintain [Goodbody's] business as a going concern, and have further advised that the efforts of both [Goodbody] and the Exchange to arrange alternative means of meeting this need for additional Net Capital have proven fruitless, \* \* \* in the absence of any other available alternative, to meet such need;

\* \* \* \* \* \* \*

WHEREAS, [Goodbody] has concluded that it is necessary in order to provide a longer term possible solution \* \* \* to transfer \* \* \* its going business as presently conducted \* \* \*

WHEREAS, \* \* \* the objectives above described are in the best interests of the public customers of [Goodbody], the Exchange and the financial community

\* \* \* \* \* \* \*

\* \* \* the parties hereto mutually covenant and agree as follows:

\* \* \* \* \* \* \*

4. *Transfer of Assets.* At the Closing, [Goodbody], to effect the Transfer, shall convey, assign, transfer, deliver and set over to [Merrill Lynch] \* \* \* all of its right, title and interest at the time of the Closing in the \* \* \* assets and properties of [Goodbody] \* \* \*

\* \* \* \* \* \* \*

5. *Assumption of Liabilities.* At the Closing, [Merrill Lynch], to effect the Transfer, shall assume from [Goodbody], undertake to pay or discharge when due, and thereafter relieve and hold [Goodbody] harmless with respect to, all of [Goodbody's] obligations and liabilities at the time of Closing \* \* \*

\* \* \* \* \* \* \*

6. *Pending Litigation.* At the Closing, [Merrill Lynch] \* \* \* will undertake the defense or prosecution of all the items of litigation to which [Goodbody] is a party \* \* \* which remain pending at the Closing Date.

7. *Employment of Partners.* Commencing with the Closing, [Merrill Lynch] \* \* \* will employ all partners of [Goodbody] \* \* \* at a salary equivalent to their fixed salary \* \* \* as in effect at October 27, 1970, until such time as [Merrill Lynch] \* \* \* in its sole discretion shall change, modify or amend the terms of their employment.

8. *Accountants' Examinations and Certificates.*

\* \* \* \* \* \* \*

The certified public accountants for [Merrill Lynch] shall audit [Goodbody's] accounts as of the Closing, render their audit report thereon

and prepare on the basis thereof and in accordance with the terms of this Agreement a certificate of net value of the Transfer at the Closing. * * *

The Net Value of the Transfer shall be computed by valuing * * * all Assets and all Liabilities (as both such terms are defined in this Agreement), subject to such reasonable reserves as may be appropriate in accordance with generally accepted accounting principles, and by subtracting from such value of all Assets such value of all Liabilities; *provided, however,* that no value shall be assigned for these purposes to the Goodbody name, [or] to any Partnership good will items * * *

9. *Purchase Price.* In consideration of the Transfer * * * an amount equal to the Net Value of the Transfer shall be paid by [Merrill Lynch] * * * to [the designee of] * * * [Goodbody] and the Exchange.

 * * * * * * *

If the Net Value of the Transfer is negative by reason of an excess of Liabilities over Assets, [Goodbody] shall be obligated to pay to [Merrill Lynch] the amount of such Net Value deficit, unless the Exchange shall pay the amount of said deficit under * * * [the Indemnification Agreement].

 * * * * * * *

13. *Financial and Other Records of the Partnership Business.* At the Closing, [Goodbody] shall deliver or make available to [Merrill Lynch] all books of account and financial records of the Partnership * * *

 * * * * * * *

15. *Miscellaneous Agreements.* * * *

b. * * * [Goodbody] will not dissolve at any time prior to December 31, 1977 without the express prior consent thereto of both [Merrill Lynch] and the Exchange.

## (2) *Senior Subordination Agreement*

This agreement between Merrill Lynch and Goodbody provided for Merrill Lynch to loan Goodbody securities worth at least $15 million so that Goodbody could meet its capital requirements in the interim period before the closing. Upon the closing, the securities were to be returned to Merrill Lynch.

## (3) *Instrument of Indemnification and Guarantee*

This instrument required NYSE, if the closing did not take place, to pay Merrill Lynch the amount of any loss incurred by reason of the securities loan made in the subordination agreement (see 2 above). If the closing referred to in the financing agreement did take place, then NYSE was obligated to pay to Merrill Lynch the amount by which the liabilities of Goodbody exceeded its assets, but not more

than $20 million (deficit net worth indemnification). In addition, NYSE obligated itself to pay to Merrill Lynch, to the extent of $10 million, any loss, liability, damages, fines, costs, and attorneys' fees resulting from any litigation or settlement of such litigation relating to the operation of Goodbody's business prior to the closing (litigation indemnification). The payment of all amounts due was contingent upon establishing the amount of liability, and Merrill Lynch was obligated to assign to NYSE any claims against Goodbody to the extent of amounts reimbursed. The preamble to the indemnification agreement states that it is "In consideration of the action taken by [Merrill Lynch] * * * at the request of [NYSE] * * * to relieve the * * * financial distress of [Goodbody]."

### (4) *Escrow and Reimbursement Agreement*

Under this agreement, Goodbody and its general partners were to deposit any amount received from Merrill Lynch under the financing agreement (if Goodbody had a positive net worth) plus any refunds of Federal, State, or local income taxes to the extent such refund related to operating losses of Goodbody for 1970. Such escrow could be used to reimburse NYSE for amounts paid to Merrill Lynch under the indemnification agreement. Goodbody and each general partner agreed to jointly and severally indemnify and hold harmless NYSE for amounts paid to Merrill Lynch under the indemnification agreement.

Because of the unusual nature of the transaction and the large indemnity involved, the NYSE constitution had to be amended to allow the Exchange to enter into the "Goodbody Agreements." In order to pay any obligation under the indemnification agreement, the amendment provided for an assessment of its members. In connection with the amendment, the president of NYSE sent a letter to each of its members, outlining the contents of the agreements, and the justification for NYSE involvement. The first two paragraphs of this letter read as follows:

In a short time, the Exchange membership will be asked to approve an amendment that is a necessary part of a three-way agreement between the Exchange, Merrill Lynch and Goodbody. Intended to avoid the financial collapse of Goodbody, this arrangement was entered into only

after Goodbody, under close Exchange supervision, intensively explored a long series of other means of raising capital, and merger and acquisition possibilities. The Exchange sought unsuccessfully to persuade other firms—individually and collectively—to provide the means to prevent the collapse of Goodbody.

After failing to interest others in the venture, the Exchange asked Merrill Lynch to undertake the massive task of preserving Goodbody. After being convinced that no other alternative was possible within the time available, Merrill Lynch agreed reluctantly to help in order to save Goodbody's customers. Merrill Lynch has publicly stated that they would have been glad to turn the job over to anyone who wanted it, and could handle it. No one else offered any practical proposal that would have saved Goodbody customers.

On December 9, 1970, the amendment to the constitution was approved.

On December 11, 1970, the closing contemplated in the financing agreement took place. The following documents were executed: bill of sale and power of attorney, instrument of assumption of liabilities, power of attorney, agreement by Goodbody not to use its name or surname, and legal opinions regarding the legitimacy of the transaction. No formal dissolution of Goodbody occurred on December 11, 1970, nor was any distribution made by Goodbody to any petitioner on or after December 11, 1970. On that date, Goodbody transferred its assets and liabilities to Goodbody & Co., Inc., a subsidiary of Merrill Lynch. Most of Goodbody's customer accounts were, within a short time, transferred to Merrill Lynch.

Merrill Lynch retained the accounting firm of Haskins & Sells to render a report as of December 11, 1970, of the financial condition of Goodbody. This report was entitled "Answers to Financial Questionnaire and Supplementary Schedules" as of December 11, 1970 (Haskins report or report). In such report, the accountants made additions to the reserves previously recorded on Goodbody's books. The reserves were required for "unresolved securities differences, unconfirmed securities held by transfer agents, customer accounts in deficit, and unconfirmed debit balances and short security positions in dividend and suspense accounts" (in short, for "back office" losses). The reserves were originally set up during the August Ernst audit. The amount of the reserves was determined by "marking to market" any missing or excess securities, and adding in the

amount of "dividend errors," as of December 11, 1970, and computing gain or loss. This "total exposure" figure, the maximum possible liability, was then reduced by predetermined percentages to reflect the fact that some customers would either not discover or claim the errors. The precise amount of gain or loss was not determinable until the securities in question were actually bought or sold. By letter dated March 15, 1971, Haskins & Sells advised Merrill Lynch, Goodbody, Ernst & Ernst, and NYSE that they had completed their examination of the accounts of Goodbody and rendered its report in accordance with the terms of the November 5, 1970, agreements. Haskins & Sells computed the net value of the transfer as of the closing to be as follows:

| | | |
|---|---|---|
| Value of assets less liabilities | | $21,697,000 |
| Less reserves on books | $17,981,000 | |
| Additional reserves | 28,060,000 | |
| Total reserves | 46,041,000 | |
| Net value (deficit) of transfer at closing (after deducting reserves) | | (24,344,000) |

The report was prepared according to generally accepted accounting principles. At the time of the report's issuance, the total amount of the reserves was unchanged.

Most of the open transactions represented by the additional liability reserves (fails to receive, fails to deliver, etc.) were closed out—securities sold or purchased—within 1 to 2 years, although some were still open after 5 years. Annual reports by Haskins & Sells stated that the reserve amounts originally set up were still reasonable, even after several years.

Pursuant to the indemnification agreement, NYSE paid Merrill Lynch approximately $26 million.[3] Merrill Lynch never pursued the Goodbody partners for the excess of the deficit net worth ($24 million) over the amount indemnified (maximum $20 million). Merrill Lynch also expended millions of dollars in additional amounts in connection with these transactions.

---

[3]This is a composite figure for both the deficit net worth indemnification and litigation indemnification.

NYSE commenced lawsuits against the Goodbody partners under the reimbursement agreement. Many of the partners settled with the Exchange.[4] NYSE obtained judgments for approximately $27 million against seven of the partners.[5] Cases against those partners who had declared bankruptcy were dismissed.[6] Some of the partners could not be served with a summons and complaint, including petitioner Mark Ettinger. After conclusion of the litigation, the Exchange settled with those partners who had gone to trial.

The chart below, computed as of December 11, 1970, shows the amount of capital that each petitioner contributed to the partnership and each petitioner's partnership share stated as a percentage:

| Petitioner | Capital contribution | Percent |
|---|---|---|
| Joseph La Rue | $1,000 | 0.6 |
| Otto Lowe, Jr. | 1,000 | 0.35 |
| Robert Schiffer | 44,000 | 0.75 |
| Alfred Fasulo | 13,000 | 0.6 |
| Mark Ettinger | 1,000 | 0.25 |
| John E. Brick | 10,000 | 0.7 |
| Alfred Seaber | 195,000 | 3.5 |

The net worth of Goodbody as of December 11, 1970, was a deficit of $24,344,000. Petitioners have conceded all other partnership adjustments for the years 1967 through 1970. The only issues remaining relate to the Merrill Lynch transaction.

OPINION

The issues for our consideration involve the tax consequences of the assimilation of Goodbody's assets and liabilities into Merrill Lynch.[7] An initial matter must be

[4]None of petitioners settled with the Exchange.
[5]These included petitioners Alfred M. Seaber and Robert Schiffer.
[6]These included petitioners John Brick, Otto Lowe, Jr., Alfred Fasulo, and Joseph W. La Rue.
[7]Respondent originally disallowed the additions to reserves when Goodbody attempted to deduct them on its original return. Respondent's reasoning was that the reserves did not meet the "all events" test for deductibility prescribed in the regulations. Sec. 1.461-1(a)(2), Income Tax Regs. Petitioners then abandoned the deduction argument, conceding this issue, and contended that the reserves were liabilities of the partnership, includable in the bases of their partnership interests. Then, petitioners claimed as an ordinary loss, based upon the worthlessness of their partnership interests or abandonment of partnership assets, the amount of their partnership interests, increased by the partnership liabilities and the reserve determined by the accountants for "back room" problems. There is, accordingly, left to consider the parties self-imposed issue dichotomy of whether this transaction constitutes a

resolved before the substantive issues are dealt with.[8] The parties have argued about the exact amount of Goodbody's assets and liabilities, and the probative value of petitioners' Exhibit 135, an internal document with a purportedly accurate balance sheet. The parties appear to agree, and if not, we have found as a fact, that the net worth of Goodbody as of December 11, 1970, conditioned upon whether the disputed reserves are allowed, is a deficit of $24,344,000. As discussed below, that is the only critical figure. Merrill Lynch accepted all of Goodbody's assets and liabilities as of December 11, 1970. To determine the amount, if any, of the claimed losses, we must consider petitioners' bases in their partnership interest.

## Basis

### (1) *Liability Reserves*

A partner's basis in his partnership interest equals the amount of money plus the adjusted basis of property contributed.[9] Sec. 722.[10] Basis is then adjusted to reflect the income and expenses from operations of the partnership. Sec. 705. In addition, a partner's share of partnership liabilities is treated as a contribution of money to the partnership, increasing the partner's basis in his partnership interest. Sec. 752(a).

At issue is the propriety of including in the partners' bases liability reserves, originally set up pursuant to the August Ernst audit, and added to by Haskins & Sells in the March 15, 1971, report. The reserves were attributable to liabilities from "back office" failures—fails to receive, fails to deliver, securities differences, and dividend errors. Petitioners attempted to deduct these reserves as expenses on their 1970 income tax returns. These expenses were disal-

---

sale or Exchange (as respondent urges) or a loss from worthlessness or abandonment (as petitioners urge). These go to the characterization of the resultant amounts as capital or ordinary in nature. Preliminary to any such consideration, we must consider whether the transaction resulted in a gain or loss and the amount thereof.

[8]Petitioners have conceded several partnership adjustments for the years 1967 through 1970.

[9]Petitioners argue in the alternative that their partnership interests became worthless or that partnership assets were abandoned. There is no difference in calculating the amount of the loss under either approach.

[10]All section references are to the Internal Revenue Code of 1954 as amended and in effect during the year at issue.

lowed by respondent, and petitioners have conceded such adjustments. Now, petitioners attempt to include the reserves in the bases of their partnership interests in determining the amount of their loss.

These liabilities are connected with partnership expenses. The proper time for taking an expense deduction is determined by the taxpayer's method of accounting. Sec. 461(a). The Goodbody partnership was on the accrual method of accounting. Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of liability and the amount thereof can be determined with reasonable accuracy. Sec. 1.461-1(a)(2), Income Tax Regs.; *United States v. Anderson,* 269 U.S. 422 (1926); *United States v. Hughes Properties, Inc.,* 476 U.S. 593 (1986).

Section 1.461-1(a)(2), Income Tax Regs., provides the test for the proper time for deducting an expense. There is no corresponding test in the regulations for the inclusion of a liability in the basis of a partnership interest. However, we have previously considered this issue. *Long v. Commissioner,* 71 T.C. 1 (1978), motion for reconsideration denied 71 T.C. 724 (1979), affd. in part and revd. in part on other issues 660 F.2d 416 (10th Cir. 1981). In *Long,* the beneficiaries of a decedent partner attempted to include certain liabilities in the basis of the decedent's partnership interest. The claimed liabilities were contested, as attested to by lawsuits, and indefinite in amount, as attested to by a settlement for a fraction of the amount originally claimed. We held that these contingent liabilities could not be included in the partner's basis until the year of settlement. The test used in *Long* focused on the fact of liability and whether the amount of the liability was definite or fixed. This test is similar, if not identical, to the "all-events" test for deduction of accrued expenses. Because an accrual basis partnership uses the "all-events" test to determine when an expense is deductible, we think that test may be properly used to determine when the corresponding liability is includable in basis. Cf. *Long.* Compare *Security Flour Mills Co. v. Commissioner,* 321 U.S. 281 (1944) (contested tax liability indefinite in amount not deductible), with *Albany Car Wheel Co. v. Commissioner,* 40 T.C. 831 (1963), affd. per

curiam 333 F.2d 653 (2d Cir. 1964); *Yoc Heating Corp. v. Commissioner*, 61 T.C. 168 (1973) (contingent or contested liabilities are not included in an asset's basis).

Once the "back office" failures occurred, Goodbody incurred an obligation. The partnership was contractually obligated to its customers under the NYSE rules. Goodbody was under an obligation to replace any missing securities or money. Essentially, Goodbody's books were in error because of the back office problems, and the Haskins report reflected estimated liability figures. All of petitioners' witnesses testified that these were transactions for which the partnership was liable. There was, however, a contingency or speculative quality concerning the amount of Goodbody's liability. Until any missing securities were purchased or excess securities sold, at market price, there was no way of determining the amount of loss, or in some circumstances, gain.

Petitioners have not shown that these amounts were determinable with reasonable accuracy. As a result of the Haskins audit, Goodbody (and Merrill Lynch) knew which particular securities would have to be sold or purchased and how much money was missing from customer accounts. However, it was not certain upon which of these claims Goodbody would ultimately be liable, because the smaller the amount of the transaction the less likely the customer would be to claim it. In addition, the exact amount of loss or gain was not determinable until actual purchase or sale. [11] Valuation of the claims may be a purely ministerial matter because of the ready market for securities, but is not readily determinable until purchase or sale occurs. The additional reserves reflected potential liabilities of the partnership, valued by reference to listed stock prices but before actual sale or purchase and, accordingly, represented estimates. Accrual accounting requires that the amount be determinable with "reasonable accuracy." A loss is not determinable until the securities are actually purchased or sold and the transaction closed. We accordingly hold that because the reserves were not a fixed obligation of the partnership sufficiently determinable in amount in 1970,

---

[11] In the case of cash transactions, i.e., missing payments of interest or dividends, no security valuation was necessary as the amount missing could be readily computed.

they cannot be included in the partners' bases in that year.[12]

(2) *Merrill Lynch Transaction*

Goodbody's transfer of its business to Merrill Lynch occasioned further adjustments to the partners' bases. Nonliquidating distributions reduce the basis of the partnership interest by the amount of money distributed to the partner. Sec. 733.[13] The parties have stipulated that the partners received no distribution from the partnership on or after December 11, 1970. However, under section 752(b) a decrease in a partner's share of partnership liabilities results in a deemed distribution of money to the partners. Petitioners contend that the Merrill Lynch transaction did not result in a decrease in Goodbody's liabilities. They contend that the language in the financing agreement whereby Merrill Lynch assumed its liabilities and agreed to hold Goodbody harmless was not the true understanding of the parties. They argue that the agreements must be considered in light of the accompanying indemnification and reimbursement agreements, and New York law which holds that the original debtor is not absolved from a liability until the third party creditor has knowledge of the assumption of the debt and consents. See *Westgate North, Inc. v. State University of New York,* 77 Misc. 2d 611, 354 N.Y.S.2d 281 (Ct. Cl. 1973), affd. 47 A.D.2d 1004, 368 N.Y.S.2d 1020 (3d Dept. 1975). Respondent urges that we apply the plain language of the financing agreement. We agree with respondent.[14]

The transaction in its entirety must be examined in a realistic economic sense to determine the consequences to

[12]There is some question as to whether the reserves are $44 million or $46 million. On the Haskins & Sells report, assets less liabilities (exclusive of reserves) equaled approximately $21 million with a $46 million reserve. Exhibit 135 shows assets less liabilities of $19 million and a $44 million reserve. The difference appears to be attributable to certain restricted securities. It appears that when these securities are included in assets, a corresponding amount is included in reserves. In both cases, the same net worth figure is reached—a deficit of approximately $24 million. That appears to be the pertinent figure.

[13]A liquidating distribution would eliminate the partner's interest and any adjusted basis, as gain or loss would be recognized. Whether or not this distribution constitutes a liquidating distribution is discussed in connection with the sale or exchange/worthlessness issue.

[14]The parties disagree as to whether current liabilities are $216 million or $187 million. We are inclined to believe the testimony of witness David Green that the difference is due to the netting of some assets against liabilities in the lower figure, and that the actual figure is $216 million.

the partners. First and foremost, the financing agreement unambiguously states that Merrill Lynch assumes Goodbody's liabilities. The agreements, taken as a whole, show that Merrill Lynch took over Goodbody's "going business," its assets and liabilities. When the transferee of property assumes liabilities, or takes property subject to liabilities, the transferor realizes an amount equal to the debt. *Crane v. Commissioner,* 331 U.S. 1 (1947); *Commissioner v. Tufts,* 461 U.S. 300 (1983); *Edgar v. Commissioner,* 56 T.C. 717 (1971). Analogously, when a partnership transfers property encumbered with liabilities, the assumption decreases partnership liabilities. This results in a constructive cash distribution reducing the partners' bases. Secs. 752(b), 733.

Petitioners' State law argument is unconvincing. We acknowledge that under New York law petitioners may have remained liable to third party creditors.[15] *Westgate North, Inc. v. State University of New York, supra.* However, because Merrill Lynch assumed Goodbody's liabilities, Merrill Lynch became the party ultimately liable on the debts. Even if the creditors proceeded against the partners, the partners would have a cause of action against Merrill Lynch under the "assumes and holds harmless" language of the financing agreement. Where the transferee is ultimately liable on the debt, it is irrelevant for purposes of section 752 that the partnership remains liable to creditors. *Smith v. Commissioner,* 84 T.C. 889, 908 (1985).[16]

The parties must determine the exact state of affairs with respect to petitioners' bases in their partnership interests as of December 11, 1970. With a given set of assumptions the

---

[15] As petitioners state the law, the creditors are not obligated to accept performance by Merrill Lynch, but *may* proceed against Goodbody. Petitioners have not advanced any reasons why a creditor would not accept payment by Merrill Lynch, or why Merrill Lynch would refuse to honor its obligations under the agreements.

[16] Goodbody or its partners may have been entitled to a loss deduction in 1971. Under the financing agreement, "[Goodbody] shall be obligated to pay to [Merrill Lynch] the amount of [any] Net Value Deficit." The Haskins report computed a deficit of approximately $24 million. Although under the indemnification agreement NYSE was liable for losses of Goodbody up to $20 million, under the reimbursement agreement, the Goodbody partners may have been responsible for amounts paid by the Exchange. Thus, petitioners would argue that the fact of liability was established by the financing and reimbursement agreements, and the amount by the Haskins report in 1971. We need not address these arguments because 1971 is not at issue here. We note that petitioners, if they had argued this point, would have had some difficulty because of the litigation with the Exchange under the reimbursement agreement and the fact that some of the partners were not on an accrual method of accounting.

manner in which the amount of loss should be calculated is demonstrated below.

Assume that prior to the report of March 15, 1971, Goodbody's balance sheet looked like this:[17]

| Assets | $236,000,000 | Liabilities (current) | $216,000,000 |
|--------|--------------|-----------------------|--------------|
| | | Net worth | [18]20,000,000 |
| Total | 236,000,000 | | 236,000,000 |

Assume basis equals net worth plus liabilities, so that the partners' aggregate bases equaled $236 million. When the Merrill Lynch transaction occurred the partners were relieved of liabilities, an amount realized (and/or an amount reducing basis) of $216 million. Secs. 752(b), 733. This leaves the partners' aggregate amount of loss at $20 million.[19]

### Worthlessness/Abandonment—Sale or Exchange

The underlying transaction is somewhat complex and unique. It has some characteristics of a sale or exchange, a receivership, a liquidation, and a merger. Understandably, then, the characterization of this transaction for Federal income tax purposes is not a routine task.[20]

Respondent contends that the transaction with Merrill Lynch constituted a sale or exchange resulting in a capital loss because a partnership interest is a capital asset. In the alternative, respondent contends that the partnership liquidated, causing constructive liquidating distributions that resulted in capital losses to the partners. Petitioners contend that their partnership interests were worthless, thereby allowing an ordinary loss deduction, or, in the alternative that the partnership abandoned its business and assets, thus permitting an ordinary loss to pass through to the partners.

Losses allowed by section 165 may be either ordinary or capital in character. Section 1222 defines a capital loss as

---

[17]This appears to be the situation of Goodbody prior to the addition of the liability reserves, assuming this balance sheet accurately reflects charges to basis and capital accounts.

[18]This amount may be attributable to limited partnership capital, and not to petitioners' interests.

[19]To the extent the $20 million net worth is attributable to limited partnership capital (note 18 *supra*), petitioners would not be entitled to any loss. It is possible that petitioners realized a gain if any of them had negative capital accounts. Respondent did not argue that the transaction resulted in taxable gain and we deem this issue conceded.

[20]Our holding here is unnecessary if the parties' Rule 155 calculation reveals that petitioners did not suffer losses.

a loss from the sale or exchange of a capital asset. A partnership interest is a capital asset under section 741. We must determine whether an actual or constructive sale or exchange occurred here.

The touchstone for sale or exchange treatment is consideration. If, in return for assets, any consideration is received, even if nominal in amount, the transaction will be classified as a sale or exchange. *Blum v. Commissioner,* 133 F.2d 447 (2d Cir. 1943). Merrill Lynch expressly assumed Goodbody's liabilities. When the transferee of property assumes liabilities of the transferor encumbering the property, the liability is an amount realized by the transferor. *Crane v. Commissioner, supra; Commissioner v. Tufts, supra.* Assumption of liabilities by the transferee constitutes consideration making the transaction a sale or exchange. *Wilkinson v. United States,* 177 F. Supp. 101 (S.D. Ala. 1959).

However, in *Stilwell v. Commissioner,* 46 T.C. 247 (1966), we held that when a two-man partnership liquidated, when the sole consideration received by one partner was relief from liabilities, no sale occurred. We based our holding on the fact that no language of sale was used in the documentation. We also concluded that if respondent's position were upheld, a sale would occur upon every liquidation of a two-man partnership. The facts in the instant case are distinguishable. Where assets are transferred to third parties, assumption of liabilities constitutes consideration. *Stilwell* involved the splitting up of assets and liabilities among partners, not the transfer of the business to a third party. Thus, we find that a sale occurred for Federal income tax purposes upon the transfer of Goodbody's business to Merrill Lynch.

A partnership interest is a capital asset. Sec. 741. The partners transferred Goodbody's business as a going concern, all of its assets and liabilities. Thus, a sale occurred of petitioners' partnership interests, not merely of partnership assets. *Hatch's Estate v. Commissioner,* 198 F.2d 26 (9th Cir. 1952); *Thornley v. Commissioner,* 147 F.2d 416 (3d Cir. 1945); *Dahlen v. Commissioner,* 24 T.C. 159 (1955). Thus, any loss on the sale would be capital in nature.

While petitioners make some persuasive arguments that their interests in Goodbody became worthless in 1970, they are to no avail.[21] A loss from the worthlessness of an asset is usually an ordinary loss. This is because a finding of worthlessness almost necessarily invokes a finding that nothing was received upon disposal of the asset; thus there is no sale or exchange.[22] This is the usual case, and with partnership interests, there should be no difference. In fact, in similar situations at least two courts, including this one, have held that the worthlessness of a partnership interest generates an ordinary loss due to the lack of a sale or exchange. *Zeeman v. United States,* 275 F. Supp. 235 (S.D.N.Y. 1967), affd. in part, remanded on other grounds 395 F.2d 861 (2d Cir. 1968); *Tejon Ranch Co. and Subsidiaries v. Commissioner,* T.C. Memo. 1985-207. However, neither of these cases dealt with the consequences of liabilities of the partnership or the transfer of the partnership business to a third party. As we have stated previously, the assumption of liabilities by a third party transferee constitutes an amount realized, and this is consideration to the transferor. *Crane v. Commissioner,* 331 U.S. 1 (1947); *Tufts v. Commissioner,* 461 U.S. 300 (1983).

The result would be unchanged if we analyze respondent's alternative position that the partnership was liquidated. In that circumstance, and as described below, the assumption of liabilities by Merrill Lynch causes a constructive liquidating distribution, which is also characterized as capital in nature for Federal tax purposes.

Section 752 of the Code prescribes the effects of liabilities upon the partnership and the partners. Assumption of or decrease in partnership liabilities is covered in section 752(b). That section provides:

---

[21]Goodbody's "back office" failure dilemma came to a climax in that year. Its capital was severely depleted and was insufficient to satisfy NYSE capital requirements. Liabilities exceeded assets by more than $20 million and all efforts to rejuvenate the firm had failed. Insolvency beyond any hope of rehabilitation indicates worthlessness. *Tejon Ranch Co. and Subsidiaries v. Commissioner,* T.C. Memo. 1985-207. Petitioners' arguments, however, ignore the fact that while the Goodbody business might have been worthless to them, it was probably worth something to Merrill Lynch. We note that the financing agreement expressly omits goodwill in the valuation, a substantial asset.

[22]Sec. 165(g) of the Code provides a constructive sale or exchange for worthless stock. No such constructive sale or Exchange is provided for a partnership interest.

SEC. 752. TREATMENT OF CERTAIN LIABILITIES.

(b) DECREASE IN PARTNER'S LIABILITIES.—Any decrease in a partner's share of the liabilities of a partnership, or any decrease in a partner's individual liabilities by reason of the assumption by the partnership of such individual liabilities, shall be considered as a distribution of money to the partner by the partnership.

The constructive distribution is governed by section 731. This section provides, in pertinent part:

SEC. 731. EXTENT OF RECOGNITION OF GAIN OR LOSS ON DISTRIBUTION.

(a) PARTNERS.—In the case of a distribution by a partnership to a partner—

(1) gain shall not be recognized to such partner, except to the extent that any money distributed exceeds the adjusted basis of such partner's interest in the partnership immediately before the distribution, and

(2) loss shall not be recognized to such partner, except that upon a distribution in liquidation[23] * * * where no property other than [money] * * * is distributed to such partner, loss shall be recognized * * *

Any gain or loss recognized under this subsection shall be considered as gain or loss from the sale or exchange of the partnership interest of the distributee partner.

Gain or loss on the constructive sale or exchange is then characterized under section 741. That section provides, in pertinent part:

SEC. 741. RECOGNITION AND CHARACTER OF GAIN OR LOSS ON SALE OR EXCHANGE.

In the case of a sale or exchange of an interest in a partnership, gain or loss shall be recognized to the transferor partner. Such gain or loss shall be considered as gain or loss from the sale or exchange of a capital asset * * *

Transactions that fall under the literal terms of the statute are inexorably destined to be capital transactions.[24] This Court has so concluded as to both abandonments and liquidations of partnership interests. *O'Brien v. Commissioner,* 77 T.C. 113 (1981); *Pietz v. Commissioner,* 59 T.C. 207 (1972); *Stilwell v. Commissioner,* 46 T.C. 247 (1966). We find the facts in the instant case to be indistinguishable.

---

[23]Sec. 761(d) defines liquidation of a partner's interest as the "termination of a partner's entire interest in a partnership by means of a distribution."

[24]This has led one commentator to state that "A partner cannot hope to obtain an ordinary loss on abandonment of a partnership interest if the partnership has liabilities." A. Willis, J. Pennell & P. Postlewaite, Partnership Taxation, sec. 101.02 (1986).

*Stilwell v. Commissioner, supra,* involved the dissolution and termination of a two-person partnership. By agreement, the other partner received all partnership assets and assumed all partnership liabilities. Under the partnership liability rules, the other partner's assumption of partnership debts resulted in a constructive distribution of money to the taxpayer. Sec. 752(b). Because the distribution resulted from termination of the partnership, it qualified as a liquidating distribution, resulting in a capital loss to the taxpayer. Secs. 731(a), 741.

*O'Brien v. Commissioner, supra,* involved a partner's abandonment of his interest in a real estate partnership. The partnership held real estate subject to nonrecourse debt. The taxpayer sent a letter to the partnership abandoning his interest and literally walked away from the venture. The partnership continued in business. The taxpayer was held to have been relieved of his share of partnership liabilities upon the abandonment of his interest, causing a constructive cash distribution under section 752(b). Further, this constructive distribution was held to be in liquidation of the partner's interest; it occurred upon termination of his partnership interest by abandonment. Loss is recognized upon such distributions to the extent the partner's adjusted basis exceeds the amount realized. Sec. 731(a)(2). This loss was deemed to be from the sale of the interest, and loss recognized from such sale is capital. Sec. 741.

*Pietz v. Commissioner, supra,* involved the liquidation of a partnership that owned a motel. The motel was financed by mortgage loans of approximately $60,000 and $160,000. The partnership sold the motel for $60,000 cash, assumption of the $160,000 loan, and a $106,000 note. The cash was applied against the $60,000 loan and the note was distributed to the taxpayers' other partner. The application of the cash sale proceeds against the loan reduced liabilities of the partnership, or of the individual partners, resulting in a constructive cash distribution. Sec. 752(b). The sale of the motel, application of the cash proceeds against the loan, and distribution of the note were parts of a plan to terminate the partnership. The constructive distribution was, therefore, a liquidating distribution. This resulted in a capital loss being incurred. Secs. 731(a), 741.

The common thread running through these three cases is the trilogy of sections 752(b), 731(a), and 741; constructive distribution in liquidation resulting in capital loss. For petitioners to succeed in classifying their loss as an ordinary one, they must prove that one or more of these sections is not applicable. In a preceding part of this opinion, we held that the partnership was relieved of its liabilities. This resulted in a constructive distribution under section 752(b). For section 731 to apply to characterize the transaction as a sale or exchange, the loss must occur as the consequence of a liquidating distribution.

Section 761(d) defines a liquidating distribution as one that terminates a partner's entire interest. We find that the constructive cash distribution terminated the partners' interests in Goodbody. The Merrill Lynch transaction effected a transfer of Goodbody's entire going business. After the transfer, the partners no longer had an ownership interest in the business or assets of Goodbody. While they retained positions with the Goodbody subsidiary, these were in an employment and not an ownership capacity. A partnership is an organization "through or by means of which any business, financial operation, or venture is carried on." Sec. 761(a). After the transfer there was no business for the partnership to carry on. The only activity of the partnership was defense of the NYSE lawsuit. We are cognizant of the fact that there was no formal dissolution and that the financing agreement provided that the partnership could not liquidate or terminate without the consent of Merrill Lynch and NYSE. That, however, does not change the fact that the partnership no longer had any business or assets. Thus, the constructive distribution was in liquidation of petitioners' interests in Goodbody.

To reflect concessions of the parties,

*Decisions will be entered under Rule 155.*