CANAL CORPORATION AND SUBSIDIARIES, FORMERLY
CHESAPEAKE CORPORATION AND SUBSIDIARIES,
PETITIONER *v*. COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT

Docket No. 14090–06.          Filed August 5, 2010.

W, a wholly owned subsidiary of parent, P, proposed to transfer its assets and most of its liabilities to a newly formed LLC in which W and GP, an unrelated corporation, would have ownership interests. P hired S, an investment bank, and PWC, an accounting firm, to advise it on structuring the transaction with GP. P also asked PWC to issue an opinion on the tax consequences of the transaction and conditioned the closing on receiving a "should" opinion from PWC that the transaction qualified as tax free. PWC issued an opinion that the transaction should not be treated as a taxable sale but rather as a tax-free contribution of property to a partnership. W contributed approximately two-thirds of the LLC's total assets in 1999 in exchange for a 5-percent interest in the LLC and a special distribution of cash. W used a portion of the cash to make a loan to P in return for a note from P. W's only assets after the transaction were its LLC interest, the note from P and a corporate jet. The LLC obtained the funds for the cash distribution by receiving a bank loan. GP guaranteed the LLC's obligation to repay the loan. W agreed to indemnify GP if GP were called on to pay the principal of the bank loan pursuant to its guaranty. The LLC thereafter borrowed funds from a financial subsidiary of GP to retire the bank loan. GP entered into a separate transaction in 2001 that required it to divest its entire interest in the LLC for antitrust purposes. W subsequently sold its LLC interest to GP, and GP then sold the entire interest in the LLC to an unrelated party. P reported gain from the sale on its consolidated Federal income tax return for 2001. R determined that P should have reported a gain when W contributed its assets to the LLC in 1999. R has also asserted a substantial understatement penalty under sec. 6662(a), I.R.C., against P in his amended answer.

199

    1. *Held*: W's asset transfer to the LLC was a disguised sale under sec. 707(a)(2)(B), I.R.C. P must include gain from the sale on its consolidated Federal income tax return for 1999.
    2. *Held*, *further*, P is liable for an accuracy-related penalty for a substantial understatement of income tax under sec. 6662(a), I.R.C.

*Clifton B. Cates III*, *Robert H. Wellen*, and *David D. Sherwood*, for petitioner.

*Curt M. Rubin*, *Matthew I. Root*, and *Steven N. Balahtsis*, for respondent.

KROUPA, *Judge*: Respondent determined a $183,458,981[1] deficiency in petitioner's (Chesapeake)[2] Federal income tax for 1999, the year at issue. Respondent asserts in his amended answer that Chesapeake owes a $36,691,796 substantial understatement of income tax penalty under section 6662(a)[3] for 1999. We must determine whether Chesapeake's subsidiary's contribution of its assets and most of its liabilities to a newly formed limited liability company and the simultaneous receipt of a $755 million distribution should be characterized as a disguised sale, requiring Chesapeake to recognize a $524 million gain in 1999, the year of contribution and distribution. We hold that the transaction was a disguised sale, requiring Chesapeake to recognize the gain. We must also determine whether Chesapeake is liable for the substantial understatement penalty under section 6662(a). We hold Chesapeake is liable for the penalty.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. We incorporate the stipulation of facts and the accompanying exhibits by this reference. Chesapeake's principal place of business at the time it filed the petition was Richmond, Virginia.

*Background of Chesapeake and WISCO*

Chesapeake is a Virginia corporation organized as a corrugated paper company in 1918. Chesapeake's business has

---

[1] All monetary amounts are rounded to the nearest dollar.

[2] Chesapeake Corporation changed its name to Canal Corporation in June 2009. We refer to the corporation as Chesapeake in this Opinion.

[3] All section references are to the Internal Revenue Code (Code), and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

expanded over time into several paper industry segments, including merchandising and specialty packaging, tissue, and forest and land development. Chesapeake eventually became a publicly traded company and served as the common parent of a group of subsidiary corporations filing consolidated Federal income tax returns. Each subsidiary managed its own assets and liabilities. Chesapeake received dividends from the subsidiaries and made loans to the subsidiaries as needed.

Chesapeake's largest subsidiary was Wisconsin Tissue Mills, Inc. (WISCO). Chesapeake purchased WISCO's stock from Philip Morris in 1985 in a leveraged buyout transaction. WISCO manufactured commercial tissue paper products, including napkins, table covers, towels, place mats, wipes, and facial and bathroom tissue. WISCO sold its products to commercial and industrial businesses such as restaurants, hotels, schools, offices, hospitals, and airlines. WISCO accounted for 46 percent of Chesapeake's sales and 94 percent of Chesapeake's earnings before interest and tax for 1998. Chesapeake and WISCO shared most of the same executive officers.

WISCO incurred significant environmental liabilities during the 1950s and 1960s. The Environmental Protection Agency (EPA) determined that a mill WISCO operated contaminated the Fox River in Wisconsin with polychlorinated biphenyls (PCBs). The EPA designated the Fox River area as a Superfund site and held five companies, including WISCO, involved in the contamination jointly and severally liable for the cleanup costs (Fox River liability). Philip Morris indemnified Chesapeake for any Fox River liability costs up to the purchase price of WISCO. Approximately $120 million of the Phillip Morris indemnity remains. Chesapeake also purchased $100 million of environmental remediation insurance to pay costs beyond those covered by the indemnity. Chesapeake's management estimated that WISCO's remaining Fox River liability costs varied between $60 million and $70 million in 1999. In addition to the Fox River liability, WISCO and other Chesapeake subsidiaries also guaranteed a $450 million credit facility enabling Chesapeake to acquire another company in 2000.

*Tissue Business*

Tissue is a capital intensive commodities business, and only the largest companies have the ability to make the investment needed to compete in the industry. In the late 1990s, the tissue business experienced much consolidation. Fort Howard Corporation merged with James River Corporation to form Fort James Corporation. Kimberly-Clark Corporation purchased Scott Paper Company. These consolidations put smaller tissue businesses at a strategic disadvantage.

Chesapeake, through WISCO and Chesapeake's Mexican subsidiary, Wisconsin Tissue de Mexico, S.A. de C.V. (WISMEX), was a second tier player in the tissue industry. Chesapeake sold its retail tissue business to the Fonda Group, Inc. in 1995. WISCO and WISMEX serviced only commercial accounts and lacked the large timber bases needed to support a retail business. Chesapeake had only two paper mills, one in Wisconsin and one in Arizona, and thus was at a significant logistical disadvantage in servicing the Southeast and Northeast.

*Restructuring of Chesapeake*

Chesapeake hired Tom Johnson as its chief executive officer and chairman in 1997. Mr. Johnson sought to restructure Chesapeake. He wanted to move Chesapeake away from its historic commodity products business and focus on specialty packaging and merchandising services. Chesapeake's speciality packaging business involved producing high-value custom packaging for such goods as perfume, liquor and pharmaceuticals. To that end, Chesapeake sold certain assets, including a mill, corrugated box plants, a building products business and substantial land. Chesapeake acquired other businesses and assets to further its specialty packaging business.

Commercial tissue did not fit the new specialty packaging strategy. Chesapeake examined several options for the future direction of WISCO's tissue business. Chesapeake considered maintaining the status quo. Management concluded, however, that WISCO would be too small to compete. Management further determined that internal expansion would be too difficult and costly. Management also considered selling Chesa-

peake and all its subsidiaries. Management surmised that no one would buy all the diverse subsidiary businesses for an acceptable price.

Pete Correll, chief executive officer of Georgia Pacific (GP), made overtures to Mr. Johnson regarding GP purchasing WISCO. GP's primary business was the manufacture and distribution of building products, timber, and paper products. GP also had a small profitable tissue business that accounted for 5 to 6 percent of its total sales. GP wanted to expand its tissue business but questioned whether GP's business could grow internally. GP viewed the purchase of WISCO as a strategic piece in advancing its tissue business.

Chesapeake considered selling WISCO to generate capital for Chesapeake's new specialty packaging business. Given Chesapeake's low tax basis in WISCO, however, the after-tax proceeds would have been low compared to the pre-tax proceeds. This tax differential caused Chesapeake to decide a direct sale of WISCO would not be advantageous.

Chesapeake thereafter engaged Salomon Smith Barney (Salomon) and PricewaterhouseCoopers (PWC) to explore strategic alternatives for the tissue business. Salomon recommended to Chesapeake's management that the best alternative for maximizing shareholder value would be a leveraged partnership structure with GP.[4] The leveraged partnership structure required WISCO to first transfer its tissue business assets to a joint venture. GP would then transfer its tissue business assets to the joint venture. Next, the joint venture would borrow funds from a third party and distribute the proceeds to Chesapeake (special distribution). Chesapeake would guarantee the third-party debt through a subsidiary. WISCO would hold a minority interest in the joint venture after the distribution, and GP would hold a majority interest. Salomon presented the leveraged partnership structure as tax advantageous to Chesapeake because it would allow Chesapeake to get cash out of the business yet still protect Chesapeake from recognizing a gain when the partnership distributed to Chesapeake the proceeds from the third-party loan.

---

[4] Salomon referred to the leveraged partnership deal as "Project Odyssey" after Homer's "The Odyssey" and identified Chesapeake as "Calypso" and GP as "Zeus."

Chesapeake's board liked the leveraged partnership idea and thought GP seemed like a good fit as a partner. Chesapeake made clear to PWC and Salomon that the asset transfer and special distribution had to be nontaxable for it to approve the transaction. Tax deferral enabled Chesapeake to accept a lower price.

GP's executives accepted the leveraged partnership structure to expand its tissue business. GP did not have any interest in Chesapeake receiving a tax deferral. GP recognized, however, that it was a necessary part of bridging the purchase price gap. Chesapeake agreed to a lower up-front valuation of WISCO,[5] $775 million, because of the tax deferral benefit.

PWC assisted Salomon in negotiating and structuring the joint venture. PWC examined the transaction from both an accounting and a tax perspective. PWC had served as Chesapeake's auditor and tax preparer for many years. Donald Compton (Mr. Compton), a partner in PWC's Richmond office, managed the Chesapeake account and had given Chesapeake advice on different tax matters in the past. David Miller (Mr. Miller)[6] worked with Mr. Compton on the Chesapeake and GP joint venture. PWC advised that Chesapeake did not need to guarantee the debt but needed only to provide an indemnity to the guarantor to defer tax. PWC also determined that the transaction should be treated as a sale for accounting purposes. Mr. Miller helped structure the indemnity agreement and aided in writing the partnership agreement.

*Indemnity Agreement*

GP agreed to guarantee the joint venture's debt and did not require Chesapeake to execute an indemnity. Mr. Miller advised Chesapeake, however, that an indemnity was required to defer tax on the transaction. Chesapeake's executives wanted to make the indemnity an obligation of WISCO rather than Chesapeake to limit the economic risk to WISCO's assets, not the assets of Chesapeake. The parties to the transaction agreed that GP would guarantee the joint ven-

---

[5] Salomon had valued WISCO between $800 and $900 million in 1998.

[6] Mr. Miller is a licensed attorney. He practiced law with the law firm Jenkens & Gilchrist before joining Coopers & Lybrand's, now PWC's, Washington National Tax practice in 1996. He was not a practicing attorney at the time he gave the legal opinion here.

ture's debt and that WISCO would serve as the indemnitor of GP's guaranty.

WISCO attempted to limit the circumstances in which it would be called upon to pay the indemnity. First, the indemnity obligation covered only the principal of the joint venture's debt, due in 30 years, not interest. Next, Chesapeake and GP agreed that GP had to first proceed against the joint venture's assets before demanding indemnification from WISCO. The agreement also provided that WISCO would receive a proportionately increased interest in the joint venture if WISCO had to make a payment under the indemnity obligation.

No provision of the indemnity obligation mandated that WISCO maintain a certain net worth. Mr. Miller determined that WISCO had to maintain a net worth of $151 million to avoid taxation on the transaction. GP was aware that WISCO's assets other than its interest in the joint venture were limited. GP nonetheless accepted the deal and never invoked the indemnity obligation.

*Joint Venture Agreement*

Chesapeake, WISCO, and GP executed the joint venture agreement. The two members (partners)[7] of the joint venture were WISCO and GP. The agreement provided that GP would reimburse WISCO for any tax cost WISCO might incur if GP were to buy out WISCO's interest in the joint venture.

*PWC Tax Opinion*

Chesapeake hired PWC to issue an opinion on the transaction's Federal tax implications. In fact, Chesapeake conditioned the transaction's closing upon PWC's issuing a "should" tax opinion. Instead of Mr. Compton, the PWC partner with the long-term relationship to Chesapeake, PWC assigned Mr. Miller to write the opinion. In effect, Mr. Miller's job was to review the transaction he helped structure. Mr. Miller considered three issues: (1) whether the joint venture qualified as a partnership for tax purposes, (2) whether WISCO was a partner in the joint venture, and (3) whether the distribu-

---

[7] We use the terms "partners," "partnership," and "LLC" for narrative convenience only as these are the terms used by the parties to the transaction. No inference should be drawn from our use of such terms regarding any legal status or relationship.

tion to Chesapeake should be treated as part of a sale or qualifies under the debt-financed distribution exception.

Chesapeake agreed to pay PWC an $800,000 fixed fee for issuing the opinion. The payment did not depend on time spent or expenses incurred by PWC. A letter PWC sent to Chesapeake stated that PWC would bill Chesapeake "at the closing of the joint venture financing." Chesapeake's board informed Mr. Miller that as a condition to closing the transaction PWC would need to issue the opinion that the special distribution should not be currently taxable. A "should" opinion is the highest level of comfort PWC offers to a client regarding whether the position taken by a taxpayer will succeed on the merits.

Mr. Miller and his PWC team reviewed the transaction's structure and approved each item that could affect the tax consequences. Mr. Miller crafted an "all or nothing" test for allocating the joint venture debt. Either all the liability would be allocated to WISCO or none of it would. Mr. Miller reasoned that the transaction would not be characterized as a sale provided the entire liability was allocated to WISCO. Mr. Miller found no legal authority for such a test. He created the test using his own analysis of then existing rulings and procedures.

Mr. Miller based his opinion on WISCO's indemnification of GP's guaranty being respected. Mr. Miller assumed that WISCO had the ultimate legal liability for the full amount of the debt if the joint venture became wholly worthless. Mr. Miller concluded that WISCO could defer gain until it sold its remaining assets, paid off the debt, or sold its partnership interest. Mr. Miller advised that WISCO maintain assets of at least 20 percent of its maximum exposure under the indemnity. Mr. Miller did not have direct authority requiring this percentage. He merely made this determination based on Rev. Proc. 89–12, 1989–1 C.B. 798, which was declared obsolete by Rev. Rul. 2003–99, 2003–2 C.B. 388.[8] Moreover, Rev. Proc. 89–12, *supra*, makes no reference to allocation of partnership liabilities.

---

[8] Rev. Proc. 89–12, sec. 4.07, 1989–1 C.B. 798, 801, states that the Internal Revenue Service will generally rule that an organization lacks limited liability if the net worth of the corporate general partners equals at least 10 percent of the total contributions to the limited partnership and is expected to continue to equal at least 10 percent throughout the life of the partnership.

Chesapeake also sought to transfer the assets of WISMEX to the joint venture. PWC informed Chesapeake that neither the United States nor Mexico could tax (1) the transfer of WISMEX's assets to WISCO or (2) the asset transfer from WISCO to the joint venture. Chesapeake caused WISMEX to transfer its assets to WISCO as advised by PWC.

Mr. Miller wrote and signed the "should" opinion before issuing it to Chesapeake. The parties effected the transaction on the same day PWC issued the "should" opinion.

*The Transaction*

GP and WISCO formed Georgia-Pacific Tissue LLC (LLC) as the vehicle for the joint venture. GP and WISCO treated the LLC as a partnership for tax purposes. Both partners contributed the assets of their respective tissue businesses to the LLC. GP transferred to the LLC its tissue business assets with an agreed value of $376.4 million in exchange for a 95-percent interest in the LLC. WISCO contributed to the LLC all of the assets of its tissue business with an agreed value of $775 million in exchange for a 5-percent interest in the LLC. The LLC borrowed $755.2 million from Bank of America (BOA) on the same day it received the contributions from GP and WISCO. The LLC immediately transferred the loan proceeds to Chesapeake's bank account [9] as a special cash distribution. [10] GP guaranteed payment of the BOA loan, and WISCO agreed to indemnify GP for any principal payments GP might have to make under its guaranty.

The LLC had approximately $400 million in net worth based on the parties' combined initial contribution of assets ($1.151 billion) less the BOA loan ($755.2 million), and it had a debt to equity ratio of around 2 to 1. The LLC assumed most of WISCO's liabilities but did not assume WISCO's Fox River liability. Chesapeake and WISCO both indemnified GP and held it harmless for any costs and claims that it might incur with respect to any retained liabilities of WISCO, including the Fox River liability.

WISCO used a portion of the funds from the special distribution to repay an intercompany loan to Cary Street, Chesapeake's finance subsidiary. WISCO also used portions of the

---

[9] Chesapeake maintained the bank accounts for its subsidiaries.

[10] The value of WISCO's assets contributed ($775 million) less the distribution ($755.2 million) equals the initial value of WISCO's 5-percent LLC interest ($19.8 million).

funds to pay a dividend to Chesapeake, repay amounts owed to Chesapeake and lend $151.05 million to Chesapeake in exchange for a note (intercompany note). The intercompany note was a 5-year note with an 8-percent interest rate. Chesapeake used the loan proceeds to repay debt, repurchase stock and purchase additional specialty packaging assets.

WISCO's assets following the transaction included the intercompany note with a face value of $151 million and a corporate jet worth approximately $6 million. WISCO had a net worth, excluding its LLC interest, of approximately $157 million. This represented 21 percent of its maximum exposure on the indemnity. WISCO remained subject to the Fox River liability.

*Refinancing the Debt*

The LLC refinanced the BOA loan in two parts soon after the transaction closed. First, the LLC borrowed approximately $491 million from a GP subsidiary, Georgia-Pacific Finance LLC (GP Finance) to partially retire the BOA loan. This transaction occurred about a month after the closing date. Then the LLC borrowed $263 million from GP Finance the following year to repay the balance on the BOA loan.

The GP Finance loans had terms similar to those of the BOA loans. GP executed a substantially identical guaranty in favor of the new lender, and WISCO executed a substantially identical indemnity obligation. PWC issued another opinion finding that the refinancing was tax free as well.

*Characterization of the Transaction for Tax and Non-Tax Purposes*

Chesapeake timely filed a consolidated Federal tax return for 1999. Chesapeake disclosed the transaction on Schedule M of the return and reported $377,092,299 book gain but no corresponding tax gain. Chesapeake treated the special distribution as non-taxable on the theory that it was a debt-financed transfer of consideration, not the proceeds of a sale.

Unlike its treatment for tax purposes, Chesapeake treated the transaction as a sale for financial accounting purposes. Chesapeake did not treat the indemnity obligation as a liability for accounting purposes because Chesapeake determined that there was no more than a remote chance the

indemnity would be triggered. Despite Chesapeake's characterization for tax purposes, PWC and Salomon each referred to the transaction as a sale.

Standard & Poor's, Moody's and stock analysts also treated the transaction as a sale. Chesapeake executives represented to Standard & Poor's and Moody's that the only risk associated with the transaction came not from WISCO's agreement to indemnify GP but from the tax risk. Moody's downgraded Chesapeake after the announced joint venture because of Chesapeake's readjusted focus, the monetization of WISCO, and the resulting loss of operating income. Standard & Poor's kept its rating of Chesapeake the same because Chesapeake generated significant cash by divesting itself of WISCO for $755 million and of its timberlands for $186 million.

*End of the Joint Venture*

The joint venture operated for only a full year. It ended in 2001 when GP sought to acquire the Fort James Corporation. The Department of Justice required GP to sell its LLC interest for antitrust purposes. GP contacted Svenska Cellulosa Aktiebolaget (SCA), a Swedish company, about purchasing its LLC interest. SCA informed GP that it was interested in purchasing only the entire LLC, not just GP's interest in the LLC. Therefore, GP needed to buy WISCO's interest in the joint venture. WISCO agreed to sell its minority interest in the LLC to GP for $41 million, which represented a gain of $21.2 million from its initial valuation of $19.8 million. GP also paid Chesapeake $196 million to compensate Chesapeake for any loss of tax deferral. WISCO declared a $166,080,510 dividend to Chesapeake payable by cancelling Chesapeake's promissory note in 2001.

Chesapeake reported a $524 million capital gain on its consolidated Federal tax return for 2001. Chesapeake determined that the termination of the indemnity resulted in WISCO receiving a deemed distribution under section 752. Chesapeake also reported the $196 million tax cost payment it received from GP as ordinary income on its consolidated Federal tax return for 2001.

Respondent issued Chesapeake the deficiency notice for 1999. In the deficiency notice, respondent determined the joint venture transaction to be a disguised sale that produced

$524 million of capital gain includable in Chesapeake's consolidated income for 1999. Chesapeake timely filed a petition. Respondent asserted in an amended answer a $36,691,796 accuracy-related penalty under section 6662 for substantial understatement of income tax.

## OPINION

We are asked to decide whether the joint venture transaction constituted a taxable sale. Respondent argues that Chesapeake structured the transaction to defer $524 million of capital gain for a period of 30 years or more. Specifically, respondent contends that WISCO did not bear any economic risk of loss when it entered the joint venture agreement because the anti-abuse rule disregards WISCO's obligation to indemnify GP. See sec. 1.752–2(j), Income Tax Regs. Respondent concludes that the transaction should be treated as a taxable disguised sale.

Chesapeake asserts that the transaction should not be recast as a sale. Instead, Chesapeake argues that the anti-abuse rule does not disregard WISCO's indemnity and that the LLC's distribution of cash to WISCO comes within the exception for debt-financed transfers. We disagree and begin with the general rules on disguised sales.

## I. *Disguised Sale Transactions*

The Code provides generally that partners may contribute capital to a partnership tax free and may receive a tax free return of previously taxed profits through distributions. See secs. 721, 731.[11] These nonrecognition rules do not apply, however, where the transaction is found to be a disguised sale of property. See sec. 707(a)(2)(B).[12]

A disguised sale may occur when a partner contributes property to a partnership and soon thereafter receives a distribution of money or other consideration from the partner-

---

[11] Sec. 731 concerns distributions to a partner acting in his capacity as a partner. Neither party asserts that sec. 731 applies in this case. Moreover, sec. 731 does not apply if a partner contributes property to a partnership and the partnership distributes property to the partner within a short period to effect an exchange of property between two or more partners or between the partnership and a partner. Sec. 1.731–1(c)(3), Income Tax Regs. We will not therefore consider the effect of sec. 731 on the transaction. See sec. 1.707–1(a), Income Tax Regs.

[12] Transfers described in sec. 707(a)(2)(B) are treated as occurring between a partnership and a non-partner or partner acting outside his capacity as a member of the partnership. Sec. 707(a)(1), (2)(B).

ship. *Id.* A transaction may be deemed a sale if, based on all the facts and circumstances, the partnership's distribution of money or other consideration to the partner would not have been made *but for* the partner's transfer of the property. Sec. 1.707–3(b)(1), Income Tax Regs. (emphasis added). Such contribution and distribution transactions that occur within two years of one another are presumed to effect a sale unless the facts and circumstances clearly establish otherwise (the 2-year presumption). Sec. 1.707–3(c)(1), Income Tax Regs.

Here, WISCO transferred its assets with an agreed value of $775 million to the LLC and simultaneously received a cash distribution of $755.2 million. After the transfer and distribution, WISCO had a 5-percent interest in the LLC. Its assets included only its interest in the LLC, the intercompany note and the jet. We therefore view the transactions together and presume a sale under the disguised sale rules unless the facts and circumstances dictate otherwise.

Chesapeake contends that the special distribution was not part of a disguised sale. Instead, it was a debt-financed transfer of consideration, an exception to the disguised sale rules. See sec. 1.707–5(b), Income Tax Regs. Chesapeake argues that the debt-financed transfer of consideration exception to the disguised sale rules limits the applicability of the disguised sale rules and the 2-year presumption in this case.

A. *Debt-Financed Transfer of Consideration*

We now turn to the debt-financed transfer of consideration exception to the disguised sale rules. The regulations except certain debt-financed distributions in determining whether a partner received "money or other consideration" for disguised sale purposes.[13] See *id.* A distribution financed from the proceeds of a partnership liability may be taken into account for disguised sale purposes to the extent the distribution exceeds the distributee partner's allocable share of the partnership liability. See sec. 1.707–5(b)(1), Income Tax Regs. Respondent argues that the entire distribution from the LLC to WISCO should be taken into account for purposes of determining a disguised sale because WISCO did not bear any of the allocable share of the LLC's liability to finance the distribution.

---

[13] A distribution qualifies as a debt-financed transfer if it meets certain requirements. See sec. 1.707–5(b)(1), Income Tax Regs. We consider only the requirements at issue.

We turn now to whether WISCO had any allocable share of the LLC's liability to determine whether the transaction fits within the exception.

### B. *Partner's Allocable Share of Liability* [14]

In general a partner's share of a recourse partnership liability equals the portion of that liability, if any, for which the partner bears the economic risk of loss. See sec. 1.752–1(a)(1), Income Tax Regs. A partner bears the economic risk of loss to the extent that the partner would be obligated to make an unreimbursable payment to any person (or contribute to the partnership) if the partnership were constructively liquidated and the liability became due and payable. Sec. 1.752–2(b)(1), Income Tax Regs.; see *IPO II v. Commissioner*, 122 T.C. 295, 300–301 (2004). Chesapeake contends that WISCO's indemnity of GP's guaranty imposes on WISCO the economic risk of loss for the LLC debt. Respondent concedes that an indemnity agreement generally is recognized as an obligation under the regulations. Respondent asserts, however, that WISCO's agreement should be disregarded under the anti-abuse rule for allocation of partnership debt.

### C. *Anti-Abuse Rule*

Chesapeake counters that WISCO was legally obligated to indemnify GP under the indemnity agreement and therefore WISCO should be allocated the entire economic risk of loss of the LLC's liability. We assume that all partners having an obligation to make payments on a recourse debt actually perform those obligations, irrespective of net worth, to ascertain the economic risk of loss unless the facts and circumstances indicate a plan to circumvent or avoid the obligation. Sec. 1.752–2(b)(6), Income Tax Regs. The anti-abuse rule provides that a partner's obligation to make a payment may be disregarded if (1) the facts and circumstances indicate that a principal purpose of the arrangement between the parties is

---

[14] A partner's allocable share of a partnership's recourse liability equals the partner's share of liability pursuant to sec. 752 and its regulations, multiplied by a fraction of which the numerator is the portion of the liability that is allocable to the distribution under sec. 1.163–8T, Temporary Income Tax Regs., 52 Fed. Reg. 24999 (July 2, 1987), and the denominator is the total amount of the liability. See secs. 1.707–5(b)(2)(i), 1.752–1(a)(1), 1.752–2, Income Tax Regs. The parties agree that the LLC's liability to BOA was recourse. The parties do not dispute that the special distribution to WISCO and the BOA loan were both $755.2 million. We need only determine WISCO's share of the LLC's liability under sec. 752 and its regulations.

to eliminate the partner's risk of loss or to create a facade of the partner's bearing the economic risk of loss with respect to the obligation, or (2) the facts and circumstances of the transaction evidence a plan to circumvent or avoid the obligation. See sec. 1.752–2(j)(1), (3), Income Tax Regs. Given these two tests, we must review the facts and circumstances to determine whether WISCO's indemnity agreement may be disregarded as a guise to cloak WISCO with an obligation for which it bore no actual economic risk of loss. See *IPO II v. Commissioner*, *supra* at 300–301.

### 1. *Purpose of the Indemnity Agreement*

We first consider the indemnity agreement. The parties agreed that WISCO would indemnify GP in the event GP made payment on its guaranty of the LLC's $755.2 million debt. GP did not require the indemnity, and no provision of the indemnity mandated that WISCO maintain a certain net worth. WISCO was chosen as the indemnitor, rather than Chesapeake, after PWC advised Chesapeake's executives that WISCO's indemnity would not only allow Chesapeake to defer tax on the transaction, but would also cause the economic risk of loss to be borne only by WISCO's assets, not Chesapeake's. Moreover, the contractual provisions reduced the likelihood of GP invoking the indemnity against WISCO. The indemnity covered only the loan's principal, not interest. In addition, GP would first have to proceed against the LLC's assets before demanding indemnification from WISCO. In the unlikely event WISCO had to pay on the indemnity, WISCO would receive an increased interest in the LLC proportionate to any payment made under the indemnity. We find compelling that a Chesapeake executive represented to Moody's and Standard & Poor's that the only risk associated with the transaction was the tax risk. We are left with no other conclusion than that Chesapeake crafted the indemnity agreement to limit any potential liability to WISCO's assets.

### 2. *WISCO's Assets and Liabilities*

We now focus on whether WISCO had sufficient assets to cover the indemnity regardless of how remote the possibility it would have to pay. Chesapeake maintains that WISCO had sufficient assets to cover the indemnity agreement. WISCO

contributed almost all of its assets to the LLC and received a special distribution and a 5-percent interest in the LLC. Moreover, Chesapeake contends that WISCO did not need to have a net worth covering the full amount of its obligations with respect to the LLC's debt. See sec. 1.752–2(b)(6), Income Tax Regs. WISCO's assets after the transfer to the LLC included the $151.05 million intercompany note and the $6 million jet. WISCO had a net worth, excluding its LLC interest, of approximately $157 million or 21 percent of the maximum exposure on the indemnity. The value of WISCO's LLC interest would have been zero if the indemnity were exercised because the agreement required GP to proceed and exhaust its remedies against the LLC's assets before seeking indemnification from WISCO.

We may agree with Chesapeake that no Code or regulation provision requires WISCO to have assets covering the full indemnity amount. We note, however, that a partner's obligation may be disregarded if undertaken in an arrangement to create the appearance of the partner's bearing the economic risk of loss when the substance of the arrangement is in fact otherwise. See sec. 1.752–2(j)(1), Income Tax Regs. WISCO's principal asset after the transfer was the intercompany note. The indemnity agreement did not require WISCO to retain this note or any other asset. Further, Chesapeake and its management had full and absolute control of WISCO. Nothing restricted Chesapeake from canceling the note at its discretion at any time to reduce the asset level of WISCO to zero. In fact WISCO's board, which included many Chesapeake executives, did cancel the note and issued an intercompany dividend to Chesapeake in 2001. We find WISCO's intercompany note served to create merely the appearance, rather than the reality, of economic risk for a portion of the LLC debt.

In addition, WISCO remained subject to the Fox River liability, and WISCO and other Chesapeake subsidiaries guaranteed a $450 million credit line obtained by Chesapeake in 2000. This guaranty and the Fox River liability further reduced WISCO's net worth. GP neither asked for nor received any assurances that WISCO would not further encumber its assets. We find that WISCO's agreement to indemnify GP's guaranty lacked economic substance and afforded no real protection to GP.

### 3. *Anti-Abuse Rule Illustration*

Chesapeake seeks to distinguish the transaction in this case from the transaction illustrated in the anti-abuse rule. See sec. 1.752–2(j)(4), Income Tax Regs. (illustrating when payment obligations may be disregarded). The illustration considers a consolidated group of corporations that use a thinly capitalized subsidiary as a partner in a general partnership with a recourse debt payment guaranteed by the other partner. The circumstances are deemed indicative of a plan enabling the corporate group to enjoy the losses generated by the partnership's property while avoiding the subsidiary's obligation to restore any deficit in its capital account. Chesapeake argues WISCO was not a newly-created entity, as was the subsidiary in the illustration, but had been in business before the transaction. We find WISCO's preexistence insufficient to distinguish this transaction from the illustration.

A thinly capitalized subsidiary with no business operations and no real assets cannot be used to shield a parent corporation with significant assets from being taxed on a deemed sale. Chesapeake intentionally used WISCO, rather than itself, to limit its exposure under the indemnity agreement. It further limited its exposure only to the assets of WISCO. We refuse to interpret the illustration to provide additional protection. Moreover, this appears to be a concerted plan to drain WISCO of assets and leave WISCO incapable, as a practical matter, of covering more than a small fraction of its obligation to indemnify GP. We find this analogous to the illustration because in both cases the true economic burden of the partnership debt is borne by the other partner as guarantor. Accordingly, we do not find that the anti-abuse rule illustration extricates Chesapeake, but rather it demonstrates what Chesapeake strove to accomplish.

### 4. *Rev. Proc. 89–12 Does Not Apply to Anti-Abuse Rule*

Chesapeake also argues that it would be found to bear the economic risk of loss if the Court would apply a 10-percent net worth requirement. In so arguing, Chesapeake relies on Rev. Proc. 89–12, 1989–1 C.B. 798, which stated that a limited partnership would be deemed to lack limited liability for advance ruling purposes if a corporate general partner of the

partnership had a net worth equaling 10 percent or more of the total contributions to the partnership. We decline Chesapeake's invitation to extend the 10-percent net worth test. Requirements for advance ruling purposes have no bearing on whether a partner will be treated as bearing the economic risk of loss for a partnership's liability. There are no mechanical tests. The anti-abuse rule mandates that we consider the facts and circumstances. We decline to establish a bright-line percentage test to determine whether WISCO bore the economic risk of loss with respect to the LLC's liability.

### 5. *Speculative Fraudulent Conveyance Claims*

Chesapeake argues alternatively that WISCO bore the economic risk of loss because GP had a right to make fraudulent conveyance claims against Chesapeake and Chesapeake's financial subsidiary Cary Street. Chesapeake contends that such potential claims exposed WISCO to a risk of loss in excess of WISCO's net worth. This argument is flawed on many points. First, a fraudulent conveyance is simply a cause of action, not an obligation. See *La Rue v. Commissioner*, 90 T.C. 465, 478–480 (1988); see also *Long v. Commissioner*, 71 T.C. 1, 7–8 (1978), supplemented by 71 T.C. 724 (1979), affd. in part and remanded on other grounds 660 F.2d 416 (10th Cir. 1981). The Court may consider obligations only in allocating recourse liabilities of a partnership. See sec. 1.752–2(b)(3), Income Tax Regs. Next, Chesapeake's fraudulent conveyance argument connotes that Chesapeake engaged in a plan to circumvent or avoid the obligation. This argument completely undercuts and overrides Chesapeake's attempt to create an obligation on behalf of Chesapeake and Cary Street. Finally, we would render the anti-abuse rule meaningless by creating an automatic exception for speculative fraudulent conveyance claims. Accordingly, we reject this argument.

We have carefully considered the facts and circumstances and find that the indemnity agreement should be disregarded because it created no more than a remote possibility that WISCO would actually be liable for payment. Chesapeake used the indemnity to create the appearance that WISCO bore the economic risk of loss for the LLC debt when in substance the risk was borne by GP. We find that

WISCO had no economic risk of loss and should not be allocated any part of the debt incurred by the LLC.

Consequently, the distribution of cash to WISCO does not fit within the debt-financed transfer exception to the disguised sale rules. Instead, we find Chesapeake has failed to rebut the 2-year presumption. The facts and circumstances evince a disguised sale. Accordingly, we conclude that WISCO sold its business assets to GP in 1999, the year it contributed the assets to the LLC, not the year it liquidated its LLC interest.

## II. *Whether Chesapeake Is Liable for an Accuracy-Related Penalty Under Section 6662(a)*

We now turn to respondent's determination that Chesapeake is liable for the accuracy-related penalty under section 6662(a) and (b)(2) for a substantial understatement of income tax. Respondent bears the burden of proof for a penalty asserted in an amended answer. See Rule 142(a).

A substantial understatement of income tax exists for a corporation if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $10,000. Sec. 6662(d)(1); sec. 1.6662–4(b)(1), Income Tax Regs. Chesapeake's correct tax for 1999 is $217,576,519, which includes the $183,458,981 deficiency determined in the deficiency notice. Respondent has established the understatement of income tax is substantial as it exceeds both 10 percent of the correct tax ($21,757,651) and $10,000.

The accuracy-related penalty under section 6662(a) does not apply, however, to any portion of an underpayment if a taxpayer shows that there was reasonable cause for, and that the taxpayer acted in good faith with respect to, that portion. Sec. 6664(c)(1); sec. 1.6664–4(a), Income Tax Regs. We consider the pertinent facts and circumstances, including the taxpayer's efforts to assess his or her proper tax liability, the taxpayer's knowledge and experience and the reliance on the advice of a professional in determining whether the taxpayer acted with reasonable cause and in good faith. Sec. 1.6664–4(b)(1), Income Tax Regs. Generally, the most important factor is the extent of the taxpayer's effort to assess the proper tax liability. *Id.*

Reasonable cause has been found when a taxpayer selects a competent tax adviser, supplies the adviser with all relevant information and, in a manner consistent with ordinary business care and prudence, relies on the adviser's professional judgment as to the taxpayer's tax obligations. Sec. 6664(c); *United States v. Boyle*, 469 U.S. 241, 250–251 (1985); sec. 1.6664–4(b)(1), Income Tax Regs. A taxpayer may rely on the advice of any tax adviser, lawyer or accountant. *United States v. Boyle*, *supra* at 251.

The right to rely on professional tax advice, however, is not unlimited. Neither reliance on the advice of a professional tax adviser nor reliance on facts that, unknown to the taxpayer, are incorrect necessarily demonstrates or indicates reasonable cause or good faith. See *Long Term Capital Holdings v. United States*, 330 F. Supp. 2d 122, 205–206 (D. Conn. 2004), affd. 150 Fed. Appx. 40 (2d Cir. 2005). The advice must not be based on unreasonable factual or legal assumptions and must not unreasonably rely on representations, statements, findings, or agreements of the taxpayer or any other person. Sec. 1.6664–4(c)(1)(ii), Income Tax Regs. Courts have repeatedly held that it is unreasonable for a taxpayer to rely on a tax adviser actively involved in planning the transaction and tainted by an inherent conflict of interest. See, e.g., *Mortensen v. Commissioner*, 440 F.3d 375, 387 (6th Cir. 2006), affg. T.C. Memo. 2004–279; *Pasternak v. Commissioner*, 990 F.2d 893 (6th Cir. 1993), affg. *Donahue v. Commissioner*, T.C. Memo. 1991–181; *Neonatology Associates, P.A. v. Commissioner*, 115 T.C. 43 (2000), affd. 299 F.2d 221 (3d Cir. 2002). A professional tax adviser with a stake in the outcome has such a conflict of interest. See *Pasternak v. Commissioner*, *supra* at 903.

Chesapeake claims it reasonably relied in good faith on PWC's tax advice and "should" opinion and therefore no penalty should be imposed. Respondent contends that Chesapeake unreasonably relied on an opinion riddled with improper assumptions written by a tax adviser with a conflict of interest. We look to whether PWC's advice was reasonable and inquire whether PWC's advice was based on all pertinent facts and circumstances and not on unreasonable factual or legal assumptions. See *Long Term Capital Holdings v. United States*, *supra* at 205–206.

## A. *PWC Based Its Advice on Unreasonable Assumptions.*

We now focus on whether PWC's advice was reasonable. Chesapeake contends that it relied on legal analysis prescribed in PWC's "should" opinion. Chesapeake submitted a draft, not the original, of the "should" opinion into evidence. We therefore look to the draft opinion to determine whether PWC's advice was reasonable.

Chesapeake paid PWC an $800,000 flat fee for the opinion, not based on time devoted to preparing the opinion. Mr. Miller testified that he and his team spent hours on the opinion. We find this testimony inconsistent with the opinion that was admitted into evidence. The Court questions how much time could have been devoted to the draft opinion because it is littered with typographical errors, disorganized and incomplete. Moreover, Mr. Miller failed to recognize several parts of the opinion. The Court doubts that any firm would have had such a cavalier approach if the firm was being compensated solely for time devoted to rendering the opinion.

In addition, the opinion was riddled with questionable conclusions and unreasonable assumptions. Mr. Miller based his opinion on WISCO maintaining 20 percent of the LLC debt. Mr. Miller had no case law or Code authority to support this percentage, however. He instead relied on an irrelevant revenue procedure as the basis for issuing the "should" opinion. A "should" opinion is the highest level of comfort PWC offers to a client regarding whether the position taken by the client will succeed on the merits.[15] We find it unreasonable that anyone, let alone an attorney, would issue the highest level opinion a firm offers on such dubious legal reasoning.

We are also nonplused by Mr. Miller's failure to give an understandable response when asked at trial how PWC could issue a "should" opinion if no authority on point existed. He demurred that it was what Chesapeake requested. The only

[15] Mr. Miller testified that tax practitioners render different levels of opinion based on their comfort that the legal conclusions contained in the opinion are correct as a matter of law assuming the factual representations and assumptions set forth in the opinion are also correct. A "reasonable basis" opinion has a 33-percent chance of success on the merits. See sec. 1.6662–3(b)(3), Income Tax Regs. A "substantial authority" opinion has a 40-percent chance of success on the merits. See sec. 1.6662–4(d)(2), Income Tax Regs. A "more likely than not" opinion has a 51-percent chance of success on the merits. See *id.* Mr. Miller did not give an exact percentage regarding a "should" opinion, but he testified that it is materially higher than that of a "more likely than not" opinion.

explanation that makes sense to the Court is that no lesser level of comfort would have commanded the $800,000 fixed fee that Chesapeake paid for the opinion.

We are also troubled by the number of times the draft opinion uses "it appears." For example, it states: "[i]n focusing on the language of the 752 regs, it appears that such regulation adopts an all or nothing approach." Mr. Miller had no basis for that position other than his interpretation of the regulations. Further, Mr. Miller assumed that the indemnity would be effective and that WISCO would hold assets sufficient to avoid the anti-abuse rule. PWC assumed away the very crux of whether the transaction would qualify as a nontaxable contribution of assets to a partnership. In so doing PWC failed to consider that the indemnity lacked substance. Neither the joint venture agreement nor the indemnity agreement included provisions requiring WISCO to maintain any minimum level of capital or assets. WISCO and Chesapeake could also remove WISCO's main asset, the intercompany note, from WISCO's books at any time and for any reason. This possibility gutted any substance for the indemnity.

We find that Chesapeake's tax position did not warrant a "should" opinion because of the numerous assumptions and dubious legal conclusions in the haphazard draft opinion that has been admitted into the record. Further, we find it inherently unreasonable for Chesapeake to have relied on an analysis based on the specious legal assumptions.

B. *Chesapeake Lacked Good Faith*

Moreover, Chesapeake did not act with reasonable cause or in good faith as it relied on Mr. Miller's advice. Chesapeake argues that it had every reason to trust PWC's judgment because of its long-term relationship with the firm. PWC crossed over the line from trusted adviser for prior accounting purposes to advocate for a position with no authority that was based on an opinion with a high price tag—$800,000.

Any advice Chesapeake received was tainted by an inherent conflict of interest. We would be hard pressed to identify which of his hats Mr. Miller was wearing in rendering that tax opinion. There were too many. Mr. Miller not

only researched and drafted the tax opinion, but he also "audited" WISCO's and the LLC's assets to make the assumptions in the tax opinion. He made legal assumptions separate from the tax assumptions in the opinion. He reviewed State law to make sure the assumptions were valid regarding whether a partnership was formed. In addition, he was intricately involved in drafting the joint venture agreement, the operating agreement and the indemnity agreement. In essence, Mr. Miller issued an opinion on a transaction he helped plan without the normal give-and-take in negotiating terms with an outside party. We are aware of no terms or conditions that GP required before it would close the transaction. We are aware only of the condition that Chesapeake's board would not close unless it received the "should" opinion. Chesapeake acted unreasonably in relying on the advice of PWC given the inherent and obvious conflict of interest. See *New Phoenix Sunrise Corp. & Subs. v. Commissioner*, 132 T.C. 161, 192–194 (2009) (reliance on opinion by law firm actively involved in developing, structuring and promoting transaction was unreasonable in face of conflict of interest); see also *CMA Consol., Inc. v. Commissioner*, T.C. Memo. 2005–16 (reliance not reasonable as advice not furnished by disinterested, objective advisers); *Stobie Creek Invs., LLC v. United States*, 82 Fed. Cl. 636, 714–715 (2008), affd. 608 Fed. 3d 1366 (Fed. Cir. 2010).

We also find suspect the exorbitant price tag associated with the sole condition of closing. Chesapeake essentially bought an insurance policy as to the taxability of the transaction. PWC received an $800,000 fixed fee for its tax opinion. PWC did not base its fee on an hourly rate plus expenses. The fee was payable and contingent on the closing of the joint venture transaction. PWC would receive payment only if it issued Chesapeake a "should" opinion on the joint venture transaction. PWC therefore had a large stake in making sure the closing occurred.

Considering all the facts and circumstances, PWC's opinion looks more like a quid pro quo arrangement than a true tax advisory opinion. If we were to bless the closeness of the relationship, we would be providing carte blanche to promoters to provide a tax opinion as part and parcel of a promotion. Independence of advisers is sacrosanct to good faith reliance. We find that PWC lacked the independence nec-

essary for Chesapeake to establish good faith reliance. We further find that Chesapeake did not act with reasonable cause or in good faith in relying on PWC's opinion. We sustain respondent's determination that Chesapeake is liable for the accuracy-related penalty under section 6662(b)(2) for 1999.[16]

We have considered all remaining arguments the parties made and, to the extent not addressed, we find them to be irrelevant, moot, or meritless.

To reflect the foregoing,

*Decision will be entered for respondent.*

---

[16] This holding should not be interpreted as requiring taxpayers to obtain a second tax opinion to qualify for the reasonable reliance exception under sec. 6664(c). Rather, we hold that taxpayers may not reasonably rely on an adviser tainted by an inherent conflict of interest the taxpayer had reason to know of.